**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **TIMOTHY J. PAGLIARA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:10-cv-00679** |
| | ) | **Judge Trauger** |
| **JOHNSTON, BARTON, PROCTOR &** | ) | |
| **ROSE, LLP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

The plaintiff, Timothy J. Pagliara, in opposition to defendant Johnston, Barton, Proctor & Rose, LLP's ("Johnston Barton") Motion to Dismiss (Dkt. 8), states as follows:

### Introduction

This case arises out of the defendant law firm's breach of its duty to the plaintiff, Timothy J. Pagliara, in connection with its handling of a claim asserted by one of Mr. Pagliara's clients, Phillip Smith. Dkt. 1 (Complaint), ¶¶ 25-30. The law firm first directed Mr. Pagliara not to discuss or resolve the claim with Mr. Smith (*Id.* at ¶ 30), and then proceeded to negotiate a settlement of the baseless claim for approximately twice the amount of any provable damages, and for an amount that will require Mr. Pagliara to disclose the filing and settlement of the claim on his Form U-4 public filings with the Financial Industry Regulatory Authority ("FINRA") now and in the future. *Id.* at ¶ 31. To make matters worse, the law firm secured from Mr. Smith a release of only its broker-dealer client, NBC Securities, Inc., in consideration for payment of the

settlement amount.  *Id.* at ¶ 29.  Mr. Smith remains free to pursue his claims against Mr. Pagliara.[1]  *Id.*

The law firm has moved to dismiss this action pursuant to Fed R. Civ. P. 12(b)(2) (personal jurisdiction) and Fed. R. Civ. P. 12(b)(6) (failure to state a claim).  Dkt. 8.  The defendant, however, is subject to personal jurisdiction for the simple reason that the defendant was served with process in the forum state (Tennessee), which automatically vests this Court with personal jurisdiction over the defendant.  *See, e.g.*, ***Burnham v. Superior Court of California, County of Marin***, 495 U.S. 604, 110 S.Ct. 2105, 2115, 109 L.Ed.2d 631 (1990) ("The short of the matter is that jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and substantial justice'").  In addition, the record demonstrates that the defendant is subject both to specific and general jurisdiction even if it had not been served with process in the forum.

The law firm's Rule 12(b)(6) motion fares no better.  The Supreme Court of Tennessee recognized in both ***Stinson v. Brand***, 738 S.W.2d 186 (Tenn. 1987), and ***Collins v. Binkley***, 750 S.W.2d 737 (Tenn. 1988), that "even if no attorney-client relationship existed or was intended, an attorney may be liable for negligence. . . to a third-party."  ***Stinson***, 738 S.W.2d at 191; ***Collins***, 750 S.W.2d at 739.  In ***Collins***, the Supreme Court articulated the ***Stinson*** rule as consisting of three elements:  (1) knowledge by the attorney that a third party was relying on his efforts; (2) a professional duty to carry out the task implicating the third party's rights; and (3) execution of that task that fell below the professional standard of care for such undertakings.  *See* ***Collins v. Binkley***, 750 S.W.2d 737, 739 (Tenn. 1988).  These "are the elements that give

---

[1] At the time it negotiated the settlement with Mr. Smith, the defendant law firm notified Mr. Pagliara that he was obligated to pay the settlement amount ($30,000) together with the fees and expenses the law firm incurred in handling the matter. *Id.* at ¶ 29.

rise to the duty of an attorney to non-clients and may result in liability for the damages sustained by non-clients." *Id.* The Complaint alleges facts sufficient to establish each such element.

For these reasons, and for those set out below, this Court should deny defendant's Motion to Dismiss.

## Rule 12(b)(6) Standard

The standards that govern a motion under Rule 12(b)(6) are well known to this Court. The Federal Rules of Civil Procedure require a plaintiff to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In deciding a motion to dismiss under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The court must assume that all of the factual allegations are true, even if they are doubtful in fact. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A complaint need not contain "detailed factual allegations," although its allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The factual allegations must "allow. . . the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

<u>**Facts**</u>

The facts relevant to defendant's Rule 12(b)(6) motion are, as stated above, those set out in the Complaint, all of which are accepted as true.  As pertinent here, the Complaint reveals the following:

1.      An investor, Phillip Smith, a resident of Tennessee, asserted a claim against Mr. Pagliara and NBC Securities, Inc. seeking to be reimbursed for losses sustained in the stock market.  Dkt. 1 (Complaint), ¶ 16.

2.      Mr. Smith was a client of Mr. Pagliara, an investment advisor and registered representative of NBC Securities, Inc. ("NBCS").  ***Id.*** at ¶¶ 5, 6.  Mr. Pagliara provides investment advice and sells securities through NBCS, which is licensed as a broker-dealer by FINRA and is qualified to do business in Tennessee.  Dkt. 9, Ex. A.  Mr. Pagliara operates the Franklin, Tennessee, branch of NBCS pursuant to a Branch Office License Agreement (the "License Agreement") dated June 3, 2002.  ***Id.***

3.      Mr. Pagliara, knowing the claim to be baseless, wanted to defend the claim and offered to indemnify NBCS against any liability arising out of the claim.  Dkt. 1 (Complaint), ¶ 23.  NBCS, however, retained the defendant, Johnston Barton Proctor & Rose, LLP, to handle the claim.  ***Id.***

4.      The defendant advised Mr. Pagliara that he was not to discuss or attempt to resolve the claim with Mr. Smith or his counsel.  ***Id.*** at ¶ 30.  The defendant further advised Mr. Pagliara that, under FINRA's rules and NBCS' policies, NBCS was to handle the claim.  ***Id.*** at ¶ 24.  Johnston Barton further advised that, under the terms of the License Agreement, Mr. Pagliara was required to indemnify NBCS for all costs incurred to defend the claim and for any amounts paid in settlement or judgment.  ***Id.***

5.     Thereafter, the defendant made no effort to learn the truth of the case.  The defendant neither met with nor spoke to Mr. Pagliara concerning the facts of the Smith case.  ***Id.*** at ¶¶ 28, 29.

6.     The defendant did know, however, that the License Agreement provided that Mr. Pagliara was required to indemnify NBCS for any amounts paid to Mr. Smith, and further knew that any settlement payment to Mr. Smith of $15,000 or more would permanently stain Mr. Pagliara's public record with FINRA.  ***Id.*** at ¶¶ 24, 31.  A licensed securities broker, like Mr. Pagliara, is required to disclose on Form U-4 a settlement payment of more than $15,000 to any claimant.  ***Id.*** at ¶ 31.

7.     Mr. Pagliara was adamantly opposed to any settlement payment of $15,000 or more to Mr. Smith.  ***Id.*** at ¶ 32.  Mr. Pagliara has been licensed to sell securities for 27 years and during his entire career has never had any blemish on his regulatory record.  ***Id.*** at ¶ 31.

8.     The defendant, nevertheless, negotiated a settlement of the Smith claim for $30,000, knowing and intending (a) that the License Agreement provided that Mr. Pagliara was to pay this amount, and (b) that such a settlement would permanently damage Mr. Pagliara's regulatory record.  ***Id.*** at ¶¶ 24, 25.  The $30,000 amount was roughly double the value of Mr. Smith's claim, even if the claim were valid, which is not the case.  ***Id.*** at ¶ 27.

9.     The defendant did not stop there.  Not only did Johnston Barton negotiate the settlement of a baseless claim for double the amount of the claim (which amount the defendant intended Mr. Pagliara to pay), and not only did Johnston Barton resolve the claim for an amount that would damage Mr. Pagliara's public record (and his reputation), but Johnston Barton negotiated a release ***only*** for NBCS.  ***Id.*** at ¶ 29.  The release that the defendant

negotiated expressly provides that Mr. Smith remains free to pursue Mr. Pagliara for further damages. *Id.*

10. Further, in what can only be described as outright deception, although the defendant affirmatively advised Mr. Pagliara that it would handle the Smith claim and that he was not to discuss or resolve the claim with Mr. Smith or his counsel, the defendant represented to Mr. Smith's counsel that it represented only NBCS and did not act on behalf of Mr. Pagliara. *Id.* at ¶ 47.

11. Mr. Pagliara has brought this action against Johnston Barton because it breached its duty to him and caused him harm.

## Argument

### I. THIS COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANT.

#### A. The Defendant Has Been Served With Process in the Forum State.

The defendant's claim that this Court lacks jurisdiction over it has been rendered meritless by the effecting of personal service upon it. Service effected in person and within the borders of the forum jurisdiction, obtained without force or fraud, has consistently and unequivocally been held by the Supreme Court to constitute valid service conferring jurisdiction. *Burnham v. Superior Court of California*, 495 U.S. 604 (1990). "[J]urisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and substantial justice.' That standard was developed by analogy to 'physical presence,' and it would be perverse to say it could now be turned against that touchstone of jurisdiction." *Id.* at 619.

The service effected on Defendant complies with the *Burnham* standard as well as with relevant state and federal rules governing service of partnerships. Fed. R. Civ. P. 4(h)

governs service on a partnership or artificial association. It requires that a copy of the summons and complaint be delivered to "an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). A partner, of course, is "the general agent of the partnership." *Stockwell v. United States*, 80 U.S. 531, 561 (1871). Thus, "process against the partnership under its partnership name, and service on one of the partners brings the partnership . . . before the Court." *Bowles v. Marx Hide & Tallow Co.*, 4 F.R.D. 297, 299 (W.D. Ky. 1945).

Even were it otherwise, this standard does not limit service to a "restricted class of formally titled officials, but rather permits it to be made upon a representative so integrated with the organization that he will know what to do with the papers." *Ins. Co. of N. Am. v. S/S Hellenic Challenger*, 88 F.R.D. 545, 548 (S.D.N.Y. 1980). Here, service was effected upon Angela McEwen, a partner with Johnston Barton. Dkt. 13; *see also* Declaration of Paul J. Krog, ¶ 2, *et seq.*[2] Even if a partner in a law firm organized as a partnership were not—as a partner in fact is—a sufficiently "formally titled official," Ms. McEwen assuredly knew "what to do with the papers."

Process, as well as service, sufficed in this case. Personal service was had within 120 days of filing, as required by Fed. R. Civ. P. 4(m). Service was effected within the original statute of limitations. The service effected upon Defendant was authorized by 28 U.S.C. § 1448. Thus, this Court acted properly when issuing the renewed process and service of that process was sufficient to comply with the dictates of Fed. R. Civ. P. 12 and 4. *See Peabody Holding Co. v. Costain Group PLC*, 808 F. Supp. 1425, 1439 (E.D. Mo. 1992); *Howse v. Zimmer Mfg., Inc.*, 109 F.R.D. 628, 631 (D. Mass. 1986).

---

[2] In their Notice (Dkt. 17) filed August 19, 2010, the defendant appears to claim that service was effected in a manner calculated to cause it embarrassment. The unsworn and unattributed factual statements in defendant's Notice are not accurate. A detailed account of what actually occurred is set forth in the Declaration of Paul J. Krog.

Johnston Barton has properly been served with process while physically within the state of Tennessee. Its presence here was not procured by force or fraud. As such, this Court may exercise personal jurisdiction over the defendant.[3]

### B. The Defendant is Subject to Specific Jurisdiction.

Although mooted by personal service, the question of specific jurisdiction remains before the Court in defendant's Motion to Dismiss. Personal jurisdiction based on a long-arm statute must comport with both the dictates of the relevant state statute and of the Fourteenth Amendment. Because Tennessee's long-arm statute permits the exercise of jurisdiction to the full extent permitted by due process, *Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn. 1985), those distinct analyses merge. The sole question, in the context of specific jurisdiction, thus becomes whether the defendant has "certain minimal contacts" with the forum—out of which the suit arises—"such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Youn v. Track, Inc.*, 324 F.3d 409, 417–418 (6th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Those contacts become "sufficient" when the defendant "'should reasonably anticipate being haled into court'" in the forum. *Id.* at 417 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

In the Sixth Circuit, a court applies the requirements of due process for specific jurisdiction via a tripartite test. *Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). "'First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action

---

[3] The fact that the defendant was originally served under Tennessee's Long Arm Statute, and then was re-served with personal service within the forum, in no way alters the analysis. *See, e.g., LaCroix v. American Horse Show Assoc., et al.*, 853 F.Supp. 992, 995 (N.D. Ohio 1994) (holding that a defendant who is re-served with process in the forum state is subject to personal jurisdiction).

must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.'" ***Cumberland & Ohio Co. ex rel. Mid-Am. Energy, Inc. v. Coffman***, __ F. Supp. 2d __ , 2010 WL 2085513 at *3 (M.D. Tenn. May 21, 2010) (quoting ***Southern Machine Co.***, 401 F.2d at 381)). "Purposeful availment is the *sine qua non*" of specific personal jurisdiction. ***Id.***

The facts of this case place it firmly in line with a series of cases decided by this Court and its sister districts throughout Tennessee and the United States. This Court found jurisdiction to exist over an out-of-state law firm that undertook the extended representation of a Tennessee client. ***Id.*** at *5. Likewise, the Western District recently exercised jurisdiction over a law firm based on its participation in litigation in Tennessee. ***Glassman, Edwards, Wade & Wyatt, P.C. v. Wolf Haldenstein Adler Freeman & Herz, LLP***, 601 F. Supp. 2d 991, 1003 (W.D. Tenn. 2009). The District of Colorado found an attorney amenable to jurisdiction after he knowingly sent two letters to a Colorado resident. ***First Entertainment, Inc. v. Firth***, 885 F. Supp. 216, 221 (D. Colo. 1995). The Fifth Circuit approved jurisdiction over a firm based on its participation in mediation and its giving advice to a client in the state. ***Streber v. Hunter***, 221 F.3d 701, 718 (5th Cir. 2000). The Tennessee Supreme Court supported such findings by holding an attorney amenable to jurisdiction here based on his preparation of instruments related to a Tennessee transaction. ***Masada Inv. Corp.***, 697 S.W.2d at 335. The Eastern District of Tennessee applied ***Masada*** in exercising its jurisdiction over an attorney who had conversed with a Tennessee resident and exercised his professional judgment regarding a Tennessee transaction. ***Gomberg v. Shosid***, No. 1:05-cv-356, 2006 WL 1881229 at *7 (E.D. Tenn. July 6, 2006).

Here, defendant directed communications to persons residing in Tennessee. Dkt. 1 (Complaint), ¶¶ 24, 30. It negotiated the settlement of a claim arising in Tennessee and asserted by a Tennessee resident. It communicated with plaintiff regarding that same claim. *Id.* In settling the claim brought by a Tennessee resident, its constituent and employee attorneys exercised their independent judgment and skills. These actions are precisely those that this and similarly situated courts have specifically found to constitute purposeful availment sufficient to permit the exercise of personal jurisdiction. Each was an action "by the defendant" directed at the forum state. *Cumberland & Ohio Co.*, 2010 WL 2085513 at *5.

With purposeful availment established, the second two elements of the *Mohasco* test follow easily. The cause of action arises from defendant's contacts with the forum because the acts giving rise to the claim are explicitly among those constituting contacts with the forum state. It cannot seriously be argued that defendant's contacts with the forum are not "related to the operative facts of the controversy." *Compuserve, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996). Finally, it is only the "unusual case," *Cumberland & Ohio Co.*, 2010 WL 2085513 at *5, in which, the first two elements of the *Mohasco* test having been met, it would still be unreasonable to assert jurisdiction. The defendant in such a case must rebut the presumption of reasonableness that arises from the fulfillment of the first two elements. *CompuServe*, 89 F.3d at 1268. Johnston Barton is a sophisticated party in a nearby jurisdiction, so the instant litigation does not pose a likelihood of "burden on the defendants." *Cumberland & Ohio Co.*, 2010 WL 2085513 at *5. Nor is the instant litigation so unwieldy so as to raise in the mind of the Court a "remarkable issue of convenience and judicial economy." *Id.* Even were such concerns present, the facts suffice to lay them to rest. As this Court evidently found in *Cumberland & Ohio Co.*,

Tennessee has an interest in "protecting its citizens from [those] who . . . breach their fiduciary duties within its borders." *Id.*

### C.      The Defendant Is Subject to General Jurisdiction.

The final font of personal jurisdiction, general jurisdiction, renders a party amenable to suit when it maintains substantial or "continuous and systematic" contacts with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984). A court finds general jurisdiction, unlike specific jurisdiction, by means of a flexible fact-specific analysis. A court considers factors such as whether the defendant solicits business in the state or sends agents into the state on a regular basis, the extent to which the defendant holds itself out as doing business in the forum, and the volume of business the defendant conducts in the forum. *Avery Dennison Corp. v. Alien Tech. Corp.*, 632 F. Supp. 2d 700, 710 (N.D. Ohio 2008).

Over the last several years, defendant has continuously engaged in the representation of a variety of Tennessee residents. (Def.'s Objections & Resps. to Pl.'s First Set of Interrogs. ¶¶ 3–4) (hereinafter "Def.'s Resps. to Interrogs."). These clients include a music publisher and several health-care industry businesses, (*Id.*), fields that represent large and integral parts of the Tennessee economy. The defendant has represented a party in at least ten (10) separate matters in Tennessee's courts or alternative dispute resolution forums. *Id.* at ¶¶ 2, 3. The Tennessee Board of Professional Responsibility's records indicate that two attorneys presently working for defendant have been admitted pro hac vice in this state since 2006. Dkt. 16, Apx. 2. Furthermore, Defendant's website holds defendant out as having a "recognized" "extensive practice" in the "Southeast region" related to, *inter alia*, health care. *Id.* at Apx. 1. This Court can take notice of the fact that Tennessee is a state within the Southeast region in which a large health-care industry is in need of legal services of the type provided by defendant.

In addition, defendant's attorneys have travelled to Tennessee on approximately twenty-four occasions for various purposes related to representation of clients over the past five years (Def.'s Resps. to Interrogs.). This number far exceeds the fourteen trips the District of New Jersey found sufficient in exercising general jurisdiction over an out-of-state law firm. *Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*, 269 F. Supp. 2d 547, 559 (D.N.J. 2003). The court there found those trips, together with legal representation in the state and the direction of communications to residents, to be a purposeful availment of the state's benefits sufficient to establish continuous and substantial contacts. *Id.* at 560. As the court there observed, a defendant's contacts need not be "daily contacts," only a "substantial level of regular, purposeful contact directed to the forum." *Id.* (internal quotation marks omitted). Defendant Johnston Barton surely has more substantial contacts than the attorney defendants in *Wartsila*: the 107 miles along interstate 65 from Birmingham to the state line is less than a tenth of the distance between the *Wartsila* defendant's Louisiana residence and the New Jersey forum.

Of course, defendant's attorneys travel to Tennessee for professional reasons beyond mere representation. As has been established, Johnston Barton sends attorneys every fall to Vanderbilt University Law School for "on-campus interviews" with Vanderbilt students. According to publicly available information on the Vanderbilt website, defendant appears to have been interviewing at Vanderbilt since at least 2005. Defendant thus derives the benefit not only of Tennessee clients and Tennessee judicial fora, but also of Tennessee's educational institutions. Defendant currently employees three Vanderbilt Law graduates and has additionally hired Vanderbilt students as summer associates. Johnston Barton's on-campus interview program establishes that its practice of hiring Vanderbilt alumni is the result of a deliberate reaching out into this state, rather than merely the fortuitous result of others' individual choices.

II.     **THE COMPLAINT STATES A CLAIM FOR WHICH**
        **RELIEF MAY BE GRANTED.**

A.      **Johnston Barton Owed a Duty to Mr. Pagliara.**

Although not framed as such, the principal issue presented by defendant's motion is whether Johnston Barton owed a duty to Mr. Pagliara. The defendant negotiated and structured a settlement that plainly damaged the plaintiff. The defendant – unnecessarily, gratuitously, and irreparably – damaged plaintiff's regulatory record and his reputation. Did this conduct violate any duty that Johnston Barton owed to Mr. Pagliara? The answer is "yes." The source of the defendant's duty to the plaintiff is threefold. First, the defendant had a duty to Mr. Pagliara pursuant to the Supreme Court of Tennessee's decisions in *Stinson v. Brand*, 738 S.W.2d 186 (Tenn. 1987), and *Collins v. Binkley*, 750 S.W.2d 737 (Tenn. 1988). Second, the defendant owed a duty to Mr. Pagliara as the indemnitor of NBCS. This duty has been recognized in *Paradigm Ins. Co. v. Langerman Law Offices, P.A.*, 24 P.3d 593, 601 (Ariz. 2001), and elsewhere. Third, the defendant owed a duty to Mr. Pagliara pursuant to *Credit General Ins. Co. v. Midwest Indemnity Corp.*, 872 F.Supp. 523 (N.D. Ill. 1995).

1.      **Johnston Barton owed a duty pursuant to**
        ***Stinson* and *Collins*.**

In Tennessee, an attorney owes a duty to a non-client where (a) the attorney knows that a third party is relying upon his efforts; (2) the attorney has a professional duty to carry out the task implicating the third party's rights; and (3) the attorney's conduct falls below the applicable standard of care. *Collins*, 750 S.W.2d at 739. As stated in *Collins*, "These are the elements that give rise to the duty of an attorney to non-clients and may result in liability for the damages sustained by non-clients." *Id.* The Complaint alleges facts, directly or by inference, sufficient to establish each of these elements.

First, the defendant knew that Mr. Pagliara was relying upon its efforts. Indeed, the defendant expressly advised Mr. Pagliara not to discuss or attempt to resolve with Mr. Smith or his counsel the claim asserted. Dkt. 1 (Complaint), ¶ 30. The defendant advised Mr. Pagliara that NBCS had invoked its exclusive right under the License Agreement to defend the claim and "intended to defend the claim." *Id.* at ¶¶ 23, 24. The defendant knew that Mr. Pagliara would (and did) rely upon these statements. Second, the defendant, having been retained by NBCS, had a professional duty to resolve (or attempt to resolve) the claim asserted by Mr. Smith. Third, the defendant executed its task in a manner that fell below the applicable standard of care. The defendant failed adequately to investigate the claim; failed to discuss the claim with Mr. Pagliara; and negotiated a settlement of the claim for roughly double the value of the claim, even had it been valued.[4] *Id.* at ¶¶ 26-29. Such conduct fell below the standard of care and damaged the plaintiff, entitling the plaintiff to recover damages.

The application of the *Stinson* rule here is even more concomitant with an attorney's professional obligations than even in either *Stinson* or *Collins*. In *Stinson*, the attorneys representing the purchaser in a real estate transaction were held to have represented the sellers as well, as the attorneys prepared all the documents and the sellers did not have separate counsel. The Supreme Court held that the attorneys could have been found to represent the sellers even though they were theoretically adverse to their conventional client. Here, the interests of the Plaintiff and NBCS, defendant's acknowledged client, were not adverse but rather were aligned in regards to the claim by Mr. Smith. Both NBCS and plaintiff would receive the maximum benefit if Mr. Smith's claim were vigorously defended and rebuffed. As

---

[4] In its Memorandum, Johnston Barton states that "The twelve or thirteen paragraphs recounting the history of Plaintiff's relationship with Mr. Smith. . . (Compl. ¶¶ 5-15, 17) are simply irrelevant to any claim asserted in this case. . ." Dkt. 9, p. 2, fn. 2. These facts, of course, serve to undermine the validity of the claim Mr. Smith asserted against Mr. Pagliara in the first place. The defendant was not concerned with these facts when it negotiated a settlement of Mr. Smith's claims, and still seems unconcerned with the facts relevant to Mr. Smith's claim.

noted *supra*, the defendant advised Mr. Pagliara that NBCS had invoked its "exclusive" right to defend the claim, and that Mr. Pagliara (and by inference his counsel) were not to contact Mr. Smith. *Id.* at ¶ 30. The defendant thus was well aware that Mr. Pagliara would be relying on its efforts to vindicate his rights in the face of Mr. Smith's meritless claim. Because that claim had been asserted against NBCS, defendant had a professional duty as NBCS's counsel to defend it. In negotiating the settlement of a meritless $16,000 claim for $30,000, defendant's conduct fell below the professional standard of care for attorneys in settlement negotiations. *See Weiler v. Kuba & Kuba*, 674 N.Y.S.2d 322, 323 (N.Y. App. Div. 1998) (settlement advice must be "reasonable"). *See also Purdy v. Pac. Auto. Ins. Co.*, 203 Cal. Rptr. 524, 535 (Cal. Ct. App. 1984); *Bill Branch Chevrolet, Inc. v. Philip L. Burnett, P.A.*, 555 So. 2d 455, 455 (Fla. Dist. Ct. App. 1990) (malpractice adequately pleaded where attorney's actions led to unjustified settlement).

   *Restatement (Third) of Law Governing Lawyers* § 51(2) (2000) also supports imposition of a duty under the circumstances presented here. Section 51(2) provides:

> . . . a lawyer owes a duty to use care within the meaning of § 52 in each of the following circumstances:
>
>       \* \* \*
>
> (2) to a nonclient when and to the extent that:
>
>   (a) the lawyer or (with the lawyer's acquiescence) the lawyer's client invites the nonclient to rely on the lawyer's opinion or provision of other legal services, and the nonclient so relies; and
>
>   (b) the nonclient is not, under applicable tort law, too remote from the lawyer to be entitled to protection;

Here, the defendant not only invited Mr. Pagliara to rely upon its provisions of legal services but advised the plaintiff that he was obligated to allow NBCS and its counsel to

defend the claim. Dkt. 1 (Complaint), ¶¶ 24, 25 and 30. Mr. Pagliara by no means is "too remote" from the defendant to be entitled to protection.

New Jersey courts have developed a sophisticated body of common law governing third-party reliance on attorney representations. The rule in that state provides that an attorney "owes a fiduciary duty to persons, though not strictly clients, who he knows or should know rely on him in his professional capacity." *R.J. Longo Constr. Co. v. Schragger*, 527 A.2d 480, 481 (N.J. Super. Ct. App. Div. 1987). The existence of a duty is a matter of law, and will be found based on the balancing of four factors: "[1] the relationship of the parties; [2] the nature of the attendant risk; [3] the opportunity and ability to exercise care; and [4] the public interest in the proposed solution." *Davin, LLC v. Daham*, 746 A.2d 1034, 1043 (N.J. Super. Ct. App. Div. 2000). *Accord Hale v. Ostrow*, 166 S.W.3d 713, 716 (Tenn. 2005) ("The existence of a duty is a question of law."). In engaging in the factoring test, the court should also seek to balance "the attorney's duty to represent clients vigorously with the duty not to provide misleading information on which third parties foreseeably will rely." *RTC Mortgage Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Co.*, 58 F. Supp. 2d 503, 521 (D.N.J. 1999). The aim of the analysis as a whole must be to "cabin the duty of the lawyer so [any] resulting obligation is fair to both lawyers and the public." *Id.* at 522 (quoting *DeAngelis v. Rose*, 727 A.2d 61, 68 (N.J. Super. Ct. App. Div. 1999)). Thus, the New Jersey courts maintain the same robust foreseeability requirement that has governed Tennessee's own third-party liability decisions. *See Petrillo v. Bachenberg*, 655 A.2d 1354, 1359–1360 (N.J. 1995).[5]

---

[5] "[A]ttorneys may owe a duty of care to non-clients when . . . the non-clients are not too remote from the attorneys to be entitled to protection. The *Restatement* [(*Third*) *of the Law Governing Lawyers* § 73]'s requirement that the lawyer invite or acquiesce in the non-client's reliance comports with our formulation that the lawyer know, or should know, of that reliance."

Examination of the Tennessee cases shows substantial alignment with the New Jersey analysis. Justifiable and foreseeable reliance govern attorney liability to third parties for representations under the *Restatement* § 552 approach applied by Tennessee courts to professionals including construction managers, *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428 (Tenn. 1991); surveyors, *Tartera v. Palumbo*, 224 Tenn. 262 (1970); accountants, *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592 (Tenn. 1991); and attorneys, *Akins v. Edmondson*, 207 S.W.3d 300 (Tenn. Ct. App. 2006). Applying the *Restatement* rule, these cases found liability based on communication of false information on which another justifiably relied, so long as the relying recipient was an intended beneficiary or known recipient of the communication and the reliance was in a transaction that the professional intended to influence or knew that his statement would influence. *Bethlehem Steel Corp.*, 822 S.W.2d at 594.

Courts in other jurisdictions have made similar findings. The Maryland Court of Appeals, in *Flaherty v. Weinberg*, 492 A.2d 618, 628 (1985), while enforcing their state's more stringent client-relationship standard, held that an attorney acquired a professional duty to a third party when hired by his client to represent that party's interests. In another situation, an attorney in Alaska was held liable to a deceased client's relatives for failing to advise one of them to disclaim gifts under the decedent's will, a step necessary properly to effectuate the testator's estate plan. *See* *Linck v. Barokas & Martin*, 667 P.2d 171 (Alaska 1983). The court held that under the circumstances, the attorneys in fact represented the entire family. *Id.* at 173.[6]

---

[6] The well-established fact that a partnership and its constituent partners are distinct legal entities does not alter the fact that the alignment of NBCS's and Mr. Pagliara's interests is reinforced by the indemnity agreement. As a partner in Capital Trust, Mr. Pagliara carried personal liability for partnership debts that the partnership assets could not satisfy. This liability, of course, represents an interest in addition to the more obvious factors, such as that it was Mr. Pagliara's conduct and the actions of his business at stake in the underlying claim.

2. The defendant owed a duty to Mr. Pagliara
as an indemnitor.

Where a party retains counsel to protect a third party's rights, the attorney may

owe a duty to the third party even if no attorney-client relationship arises between them. The

***Restatement (Third) of the Law Governing Lawyers***, § 51(3), provides a rule applicable in this

case: an attorney owes a duty to a non-client when:

> (a) the lawyer knows that a client intends as one of the primary
> objectives of the representation that the lawyer's services benefit
> the nonclient;
>
> (b) such a duty would not significantly impair the lawyer's
> performance of obligations to the client; and
>
> (c) the absence of such a duty would make enforcement of those
> obligations to the client unlikely.

Both the ***Restatement*** and courts applying it have read the rule as creating a duty

towards non-clients with a non-champertous financial stake in the outcome of litigation. For

instance, the comments state, "a lawyer designated by an insurer to defend an insured owes a

duty of care to the insurer with respect to matters as to which the interests of the insurer and

insured are not in conflict, whether or not the insurer is held to be a co-client of the lawyer." ***Id.***

at *cmt.* (g). Arizona has developed an entire body of caselaw applying the ***Restatement***

principle. The Supreme Court described the touchstone of attorney liability to third parties as the

existence of "a foreseeable risk of harm to a foreseeable non-client whose protection depended

on the actor's conduct." ***Paradigm Ins. Co. v. Langerman Law Offices, P.A.***, 24 P.3d 593, 601

(Ariz. 2001).

In ***Paradigm***, the court held an attorney, hired by an insurance company to

represent its insured, to owe a duty of care to the insurer as well. It found particularly relevant

the fact that the insurer was "dependent upon the lawyer it hire[d] on behalf of the insureds." ***Id.***

(quoting *Napier v. Bertram*, 954 P.2d 1389, 1392 (Ariz. 1998) (internal quotation marks omitted)).  Furthermore, the "lawyer's duties to the insured are often discharged for the full or partial benefit of the nonclient [insurer]." *Id.*

In the present case, NBCS retained the Defendant to defend the aligned interests of itself and Mr. Pagliara and Capital Trust.  It did so, furthermore, while still operating within the indemnification provisions of the License Agreement.  Thus, while the details of the parties' respective interests have been inverted in some regards, the basic paradigm remains:  an attorney represents one party facing a claim that implicates the related and aligned rights of a third party, which is itself bound to the original client by contractual duties, including a duty to indemnify. Given that Arizona, like Tennessee, makes the insured, not the insurer, the client of counsel retained in such cases—a rule the *Paradigm* court refused to alter—the reasoning in these cases should apply with particular clarity.

3.    <u>The modern rule establishes that Johnston<br>Barton owed a duty to the plaintiff.</u>

In *Credit General Ins. Co. v. Midwest Indemnity Corp.*, 872 F.Supp. 523, 526-27 (N.D. Ill. 1995), the court recognized that "The modern trend. . . is to recognize the existence of a duty owed by attorneys to non-clients in a variety of circumstances."  Relying upon *Lucas v. Hamm*, 364 P.2d 685 (Cal. 1961), the court held that the following six (6) factors should be balanced in order to determine whether an attorney owed a duty of care to a non-client:

(1) the extent to which the transaction was intended to affect the plaintiff;

(2) the foreseeability of harm;

(3) the degree of certainty that the plaintiff suffered injury;

(4) the closeness of the connection between the defendant's conduct and the injury suffered;

(5) the moral blame attached to the defendant's conduct; and

(6) the policy of preventing future harm.

(quoting ***Biakanja v. Irving***, 49 Cal.2d 647, 320 P.2d 16 (1958)). Applying these factors, the ***Credit General*** court found that the defendant law firm owed a duty to the plaintiff, which acted as the surety (or indemnitor) for the law firm's client. ***Credit General***, 872 F.Supp. at 527.

The Complaint here specifically alleges facts to support each of these factors:

35.     Specifically, the handling, and any settlement or other disposition, of Mr. Smith's claim was ***intended to affect*** Mr. Pagliara. Both NBCS and Johnston Barton intended that Mr. Pagliara and his partners pay the costs of defense and pay any amount awarded to Mr. Smith.

36.     It was ***foreseeable*** to Johnston Barton that its failure to handle the defense of the Smith claim properly could harm Mr. Pagliara. Johnston Barton was aware, for example, that any settlement of the Smith claim in excess of $15,000 would require disclosure in any future Form U4 filing that Mr. Pagliara would make with FINRA.

37.     There is ***no lack of certainty*** with respect to the injury Mr. Pagliara has suffered. Johnston Barton negotiated a settlement of the Smith claim for $30,000, which is an amount roughly double any out-of-pocket loss sustained by Mr. Smith, even if his claim had merit, which is not the case. Because the claim was settled for $30,000, it must now be reported on all future Form U4 filings that Mr. Pagliara makes with FINRA. Such disclosure harms Mr. Pagliara's reputation and adversely affects his business.

38.     There was ***a very close connection*** between the conduct of Johnston Barton and the injury suffered. Indeed, Johnston Barton's settlement of the claim at the indefensible amount of $30,000 caused the injury complained of.

39.     Johnston Barton's conduct was ***morally blameworthy***. It knowingly negotiated and recommended a settlement that it knew would damage Mr. Pagliara's spotless 27-year regulatory record. It did so in cooperation with its client, NBCS, which was eager to harm Mr. Pagliara.

40.    Recognition of the duty that Johnston Barton owed to plaintiff will likely *prevent similar harm* from occurring in the future.

Dkt. 1 (Complaint), ¶¶ 35-40.  The Complaint plainly states a claim for which relief may be granted.

## B.    The Complaint Adequately Alleges Proximate Cause.

The defendant claims that the Court should dismiss the Complaint on the basis that there is a lack of proximate cause as a matter of law.  Dkt. 9, p. 20.  According to the defendant, "Given NBCS' unfettered right to settle the Smith claim, no alleged action of Johnston Barton could have caused Plaintiff harm as a matter of law."  *Id.*  The premise of this argument is as invalid as the conclusion the defendant draws from it.

First, NBCS did not have an "unfettered" right to settle the Smith claim.  It is true that the License Agreement provides that "NBCS, at its sole option and without the prior approval of either the Licensee or applicable representative, may settle or compromise any claim at any time."  But this right is not an unfettered one.  The License Agreement is expressly governed by the law of the State of Alabama.  In Alabama, as in Tennessee, each provision in a written contract carries with it an implied covenant of good faith and fair dealing.  *Chavers v. Nat'l Sec. Fire & Cas. Co.*, 405 So.2d 1, 4 (Ala. 1981).  NBCS' obligation to act in good faith restricts its alleged "unfettered" right to settle any claim at any time.  The very notion that NBCS, for example, could have paid Mr. Smith, say, $1 Billion to settle this claim and then attempt to recover such amount from Mr. Pagliara pursuant to the terms of the License Agreement is preposterous.  Indeed, NBCS has, to date, not even attempted to collect the $30,000 that it paid to settle the Smith claim.  NBCS' failure to do so is an implicit admission that even the payment of $30,000 in settlement of Mr. Smith's demonstrably bogus claim was

unreasonable and therefore not collectible under the indemnification provisions of the License Agreement.

Second, proximate cause is an issue not typically well-suited to summary judgment, much less to a Rule 12(b)(6) motion. *Doe v. Linder Const. Co.*, 845 S.W.2d 173, 199 (Tenn. 1992). The Complaint more than adequately alleges that Mr. Pagliara was harmed by the defendant's conduct. For purposes of defendant's motion, these well-pleaded factual allegations must be accepted as true.

### C. The Litigation Privilege Does Not Shield Defendant From Liability.

Relying upon *Unarco Material Handling, Inc. v. Liberato*, 2010 WL 744394 (Tenn. App. Mar. 2, 2010), the defendant claims that the litigation privilege bars any claim against it for conduct alleged in the Complaint. The defendant's reliance upon *Unarco* is misplaced, for several reasons.

First, *Unarco* dealt with a motion for summary judgment, not a motion to dismiss for failure to state a claim. *Unarco* recognized that an absence of good faith or the presence of wrongful means is sufficient to defeat any claimed litigation privilege. Although *Unarco* found – on summary judgment – no lack of good faith or use of wrongful means, it cannot be seriously disputed that the Complaint here alleges conduct that evinces a lack of good faith and the use of wrongful means. Indeed, the Complaint alleges that the defendant intended to harm the plaintiff and did so by first directing Mr. Pagliara not to discuss or resolve the claim with Mr. Smith and then resolving the claim on terms harmful to Mr. Pagliara. Thus, even if *Unarco* governed this case, dismissal is not warranted.

Second, *Unarco* is fully distinguishable from the instant case. *Unarco* involved a claim against an attorney for inducing a breach of contract. The plaintiff has asserted no such

cause of action here. ***Unarco*** did not involve, as this case does, a claim where the defendant is alleged to have breached a duty owed to the plaintiff. ***Unarco*** cannot be read to extinguish a claim for an attorney's breach of duty to a client or a non-client.

> ***Unarco***, for example, held:

> . . . the litigation privilege in Tennessee applies to an attorney's conduct prior to the commencement of litigation if (1) the attorney was acting in the capacity of counsel for a client or identifiable prospective client when the conduct occurred, (2) the attorney was acting in good faith for the benefit of and on behalf of the client or prospective client, not for the attorney's self interest, (3) the conduct was related to the subject matter of proposed litigation that was under serious consideration by the attorney, and (4) there was a real nexus between the attorney's conduct and litigation under consideration. *See **Simpson***, 232 S.W.3d at 24.

***Unarco***, *9. Read out of context, as defendant attempts to do, this language could be used to extinguish a client's claim against his own attorney for failing to file a lawsuit within the applicable statute of limitations or for other negligent conduct. Plainly, ***Unarco*** did not intend such a result, nor could it. The Supreme Court established the duty an attorney owes to a non-client in ***Stinson*** and ***Collins***. Nothing in ***Unarco*** can be used to eliminate such a duty.

Third, ***Unarco*** is not binding upon this Court and should not be applied. The litigation privilege has traditionally been used to shield counsel (and others) from defamation suits based upon statements made in court. Despite Defendant's contention to the contrary, no Tennessee court has extended the litigation privilege to encompass breaches of fiduciary duty, nor did the foreign decisions on which Tennessee courts relied in rendering litigation-privilege holdings make such extensions. The Tennessee Supreme Court has applied the privilege exclusively to claims for defamation. *See **Simpson Strong-Tie Co. v. Stewart, Estes & Donnell***, 232 S.W.3d 18 (Tenn. 2007). The Supreme Court described its present role vis-à-vis the function as "defining its contours," ***id.*** at 23, a statement the ***Unarco*** court apparently viewed as

an invitation to jurisprudential innovation. But the **Unarco** court clearly misapprehended the extent of the elasticity announced by **Simpson Strong-Tie**. Furthermore, even if the **Unarco** holding were a correct statement of Tennessee law, its holding does not extend to encompass the facts before this Court.

In **Simpson Strong-Tie**, the Supreme Court announced new "contours" for the litigation privilege only insofar as it applied it to purportedly defamatory statements made in a theretofore unprecedented context (class-action solicitations). *See* **Simpson Strong-Tie**, 232 S.W.3d at 20–21. In **Unarco**, the Court of Appeals, following the lead of courts in a handful of other states,[7] applied the litigation privilege to the distinct tort of interference with business relationships—not the type of contour-defining in which the **Simpson Strong-Tie** court engaged. *See* **Unarco**, 2010 WL 744394, at *9. Defendant likewise points to the decisions of courts in several other jurisdictions to support its contention that the Tennessee privilege encompasses its conduct. Dkt. 9, p. 19. These cases are inapposite. All four cases concern allegedly tortious statements; one deals solely with interference with contracts, **Jackson v. BellSouth Telecomms**., 372 F.3d 1250 (11th Cir. 2004); another applies a California statute, **Sengchanthalangsy v. Accelerated Recovery Specialists, Inc.**, 473 F. Supp. 2d 1083 (S.D. Cal. 2007); one refuses to apply the privilege to an abuse-of-process claim, **N. Star Capital Acquisitions, LLC v. Krig**, 611 F. Supp. 2d 1324 (M.D. Fla. 2009); and the fourth discusses the privilege only in an extensive dictum following a holding that the complained-of statement did not constitute a tort to begin with, **Ruberton v. Gabage**, 654 A.2d 1002 (N.J. Super. Ct. App. Div. 1995).

---

[7] The foreign decisions on which the Court of Appeals heavily relied do not themselves appear compelling. For instance, the West Virginia Supreme Court, in *Clark v. Druckman*, 624 S.E.2d 864, 870 (2005), based its extension of the privilege on the startling and unvarnished declaration there is "no reason to distinguish between communications made during the litigation process and conduct occurring during the [same]."

Regardless, it is entirely inappropriate to apply the privilege to situations such as that at bar, and such an extension does not follow from either **Simpson Strong-Tie** or **Unarco**. The privilege serves an invaluable function in permitting attorneys and witnesses to perform, without fear of reprisal, core functions necessary for the operation of the judicial system. Even the **Unarco** court did not purport to extend the privilege so as to shield a tortfeasor who breached a distinct duty to a third party. Rather, the **Unarco** court chose to insulate attorneys who, serving solely as their client's agents, passed communications to a third party; the law firm lacked any other relationship to the plaintiff or the recipient of its client's communications. Here, by contrast, the law firm had existing ties to the third party, *see* Part II, *infra*. In both the classic privileged-defamation case and **Unarco**, the complained of tort consisted of an intentional statement in conjunction with some external factor, either an audience (defamation) or an employee's breach of contract (**Unarco**). Neither fact pattern brought the defendant attorney into conflict with a party to whom he owed any duty beyond the general duty owed by everyone to the whole world to refrain from intentionally tortious conduct. In the case at bar, by contrast, the complained-of tort consists of the existence of a fiduciary duty and conduct inconsistent with that duty.

### D.      The Complaint States a Claim Under the TCPA.

To recover under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, *et seq.* (the "TCPA"), a plaintiff must show: (1) "that the defendant engaged in an unfair or deceptive act or practice"; and (2) that the defendant's conduct caused an ascertainable loss of money or property. **Tucker v. Sierra Builders**, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (citing Tenn. Code Ann. § 47-18-109(a)(1)). "[W]hether a specific representation in a particular case is 'unfair' or 'deceptive' is a question of fact." **Id.** at 116.

Here, the Complaint asserts that the defendant acted unfairly and deceptively, *inter alia*, when it (a) negotiated the settlement of a baseless claim for an amount that has permanently and irreparably harmed Mr. Pagliara's regulatory record, and (b) directed the plaintiff not to contact Mr. Smith or his counsel to resolve the claim and then secured a release only on behalf of NBCS, leaving Mr. Smith free to pursue Mr. Pagliara. Dkt. 1 (Complaint), ¶¶ 46, 47. The defendant does not claim that such allegations fail to allege unfair or deceptive acts but rather that "lawyers practicing law" are immune from suit under the TCPA. The TCPA does not, by its terms, confer such immunity, nor has the Supreme Court of Tennessee ever recognized such immunity. Rather, the defendant relies principally upon *Schmidt v. Nat'l City Corp.*, 2008 WL 597687, *3 (E.D. Tenn. Mar. 4, 2008), which held that "[T]he TCPA does not apply to lawyers practicing law because the practice of law is a profession and is not trade or commerce as defined in the TCPA."

A more detailed analysis of this issue is set out in *Constant v. Wyeth*, 352 F.Supp.2d 847 (M.D. Tenn. 2003), and *Proctor v. Chattanooga Orthopedic Group, P.C.*, 270 S.W.3d 56 (Tenn. App. 2008). In *Constant*, this Court recognized that members of a learned profession (in *Constant*, the medical profession; here, the legal profession) are not entirely immune from claims under the Tennessee Consumer Protection Act. Thus, although neither a medical malpractice claim nor a legal malpractice claim may be re-cast as a consumer protection claim, "allegations of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of the entrepreneurial, commercial, or business aspect" of a professional practice may be brought under the Tennessee Consumer Protection Act. *Constant*, 352 F.Supp.2d 847, 854 (*quoting Nelson v. Hough*, 564 N.W.2d 482, 486 (Mich. App. 1997)). *Accord*, *Proctor*, 270 S.W.3d at 59, 60.

Here, the plaintiff's claim is properly stated under the Tennessee Consumer Protection Act because it relates, at least in part, to the business aspect of the defendant's practice. The evidence to be presented here will demonstrate that the defendant was motivated, at least in part, to act deceptively toward the plaintiff in order to satisfy NBCS and its principals, from whom the defendant derives substantial revenues. Thus, just as a physician who prescribes unnecessary surgery for a patient in order to generate additional revenues violates the applicable standard of care yet is subject to liability under the Consumer Protection Act, so too is a law firm that acts deceptively toward a non-client, here Mr. Pagliara, in order to secure a stream of income from an existing client, NBCS.

### III. EVEN WERE THE COMPLAINT NOT TO STATE A CLAIM FOR RELIEF, LEAVE TO AMEND RATHER THAN DISMISSAL IS THE APPROPRIATE REMEDY.

As set forth above, the well-pleaded facts in the Complaint, when read in the light most favorable to the plaintiff and when all inferences properly drawn from such facts are taken in favor of the plaintiff, more than adequately state a claim against the defendant. Even were such not the case, however, leave to amend the Complaint rather than outright dismissal would be the appropriate remedy. Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend should be "freely given when justice so requires." The United States Supreme Court has held that leave to amend should be granted unless there is: (1) undue delay; (2) bad faith or dilatory motive on the part of the movant; (3) repeated failure to cure deficiencies by amendments previously allowed; (4) undue prejudice to the opposing party if the amendment were granted; (5) futility of the amendment; or (6) other "declared or apparent reasons." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). *See also* ***Perkins v. American Elec. Power Fuel Supply, Inc.***, 246 F.3d 593, 605 (6th Cir. 2001) (citing ***General***

*Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990)). The Court of Appeals for the Sixth Circuit has consistently held that Rule 15(a) requires that amendments are to be granted with liberality. *See, e.g.*, *Interroyal Corp. v. Sponseller*, 889 F.2d 108 (6th Cir. 1989), *cert. denied sub nom*, *Superior Roll Forming Co. v. Interroyal Corp.*, 494 U.S. 1091, 110 S.Ct. 1839, 198 L.Ed.2d 967 (1990); *Moore v. City of Paducah*, 790 F.2d 557 (6th Cir. 1986); *Howard v. Kerr Glass Manuf. Co.*, 699 F.2d 330 (6th Cir. 1983).

Tennessee law plainly recognizes that a law firm, such as Johnston Barton Proctor & Rose, LLP, may be liable for breach of a duty to a non-client, such as Mr. Pagliara, under appropriate circumstances. Certain of these circumstances are set out in *Stinson*/*Collins*, *Paradigm Insurance*, and *Credit General*. The Complaint alleges facts sufficient to establish the elements of a cause of action under each of these authorities, but even if it did not, the plaintiff should be granted leave to amend the Complaint to allege such further and additional facts as may be necessary.

## Conclusion

For all of the foregoing reasons, this Court should deny defendant's Motion to Dismiss in all respects.

Respectfully submitted,

s/Eugene N. Bulso, Jr.
Eugene N. Bulso, Jr. (Tenn. BPR No. 12005)
Steven A. Nieters (Tenn. BPR No. 26505)
Leader, Bulso & Nolan, PLC
414 Union Street, Suite 1740
Nashville, Tennessee 37219
(615) 780-4110

*Attorneys for Plaintiff, Timothy J. Pagliara*

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2010, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to the following: Joseph F. Welborn, III, John C. Hayworth, and Emily B. Warth, Walker, Tipps & Malone, PLC, 2300 One Nashville Place, 150 Fourth Avenue North, Nashville, TN 37219.

s/Eugene N. Bulso, Jr.
Eugene N. Bulso, Jr.