## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

**TIMOTHY J. PAGLIARA,** )
)
    **Plaintiff,** )
)
**v.** )    **Case No. 3:10-cv-00679**
)    **Judge Trauger**
**JOHNSTON BARTON PROCTOR &** )
**ROSE, LLP,** )
)
    **Defendant.** )

## MEMORANDUM

Pending before the court is the Motion to Dismiss filed by defendant Johnston Barton

Proctor & Rose, LLP (Docket No. 8), to which the plaintiff has filed a response (Docket No. 19),

and in support of which the defendant has filed a reply (Docket No. 23). For the reasons

discussed below, the defendant's motion will be granted in part and denied in part.

## BACKGROUND

Plaintiff Timothy Pagliara is a licensed securities broker.[1] He is a partner of PMW

Partners, which does business in Tennessee under the name Capital Trust Wealth Management

Group ("Capital Trust"). In 2002, Pagliara and Capital Trust began working with NBC

Securities, Inc. ("NBCS"), an Alabama-based securities firm. Capital Trust and NBCS signed a

Branch Office License Agreement (the "License Agreement"), which, as the name suggests,

provided that Capital Trust would become a Tennessee branch office of NBCS. At all times

_____

[1] Unless otherwise noted, the allegations are drawn from the plaintiff's Complaint
(Docket No. 1, Ex. 1).

1

relevant to this litigation, the plaintiff was an employee of NBCS.

Eventually, there was a falling out between Capital Trust and NBCS, and the two companies became embroiled in litigation. The License Agreement provides that, in the event of a change of control of NBCS, NBCS is required to assign its obligations under the agreement to the acquiring entity. If the acquiring entity refuses, the License Agreement specifies liquidated damages of $1.2 million. In 2008, NBCS's parent company was acquired by RBC Dain Rauscher, which refused to accept assignment of the License Agreement. NBCS allegedly refused to pay Capital Trust the $1.2 million liquidated damages amount, and Capital Trust initiated arbitration. That proceeding was settled in 2009, but NBCS allegedly breached the settlement agreement, and Capital Trust filed suit in state court in 2010. That litigation is apparently ongoing.

Against this backdrop, NBCS received a complaint from one of Pagliara's longtime clients, Philip Smith.[2] In March 2008, Smith requested advice on how to invest a $100,000 certificate of deposit that was about to mature. The plaintiff discussed the benefits and risks of investing the money in dividend-paying stocks, and Smith ultimately decided to purchase stock in three large banks. The plaintiff purchased the stocks for Smith on March 11, 2008, at a price of just over $98,000. Before long, the financial crisis occurred, and by the end of the year, the value of the bank stocks had fallen precipitously.[3]

---

[2] "Philip Smith" is a pseudonym, used by the plaintiff to protect the privacy of the client.

[3] The Complaint does not state how much value Smith's stocks lost, but it does note that "the average bank stock declined in value by about 75% at the height of the crisis." (Docket No. 1, ex. 1 ¶ 12.)

2

Smith initially refused Pagliara's invitations to meet to discuss investment strategies in the face of the financial crisis. But, in April 2009, the plaintiff spoke with Smith via telephone and convinced him that financial stocks would eventually recover. The plaintiff suggested buying more bank stocks as a short-term strategy, and Smith agreed to do so. This strategy was successful, and, "[b]y April 8, 2010, the losses that Mr. Smith had sustained in his portfolio . . . had been reduced to just $16,000." (Docket No. 1, Ex. 1 ¶ 15.)

Smith was nevertheless unhappy with the events of the preceding year. He retained a securities lawyer and threatened suit against Pagliara and NBCS.[4] On November 11, 2009, Smith's lawyer mailed a letter to NBCS's Chief Compliance Offer "making various demands." (*Id.* ¶ 16.)

The License Agreement between Capital Trust and NBCS contains an indemnity provision:[5]

> [Capital Trust] shall indemnify, defend and hold harmless NBCS from and against any and all claims or actions and all costs, expenses, losses, damages and liabilities . . . arising out of the affiliation of [Capital Trust] . . . . NBCS, at its sole option and without the prior approval of either [Capital Trust] or the applicable Representative, may settle or compromise any claim at any time. [Capital Trust] does not indemnify NBCS for any liability arising from NBCS' own acts or omissions.

---

[4] Smith, who had been Pagliara's client since 1999, signed a Client Profile and Agreement with NBCS when Pagliara became affiliated with the firm.

[5] Although the plaintiff did not attach a copy of the License Agreement to his Complaint, the defendant has submitted a copy. "The Sixth Circuit has held that documents that a defendant attaches to a motion to dismiss, which are referred to in the plaintiff's complaint and are central to his claim, may be considered as part of the pleadings in resolving a motion to dismiss." *Givens v. Tenn. Football, Inc.*, 684 F. Supp. 2d 985, 990 n.3 (M.D. Tenn. 2010) (citing *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 296-97 (6th Cir. 2008)).

(Docket No. 9, Ex. 1 ¶ 6.)  The plaintiff alleges that Capital Trust offered to defend NBCS against Smith's claim, but that "NBCS asserted its exclusive right under the License Agreement to defend the claim."  (*Id.* ¶ 23.)

NBCS retained the Birmingham, Alabama-based defendant law firm, Johnston Barton Proctor & Rose, LLP ("Johnston Barton"), to handle the defense.  By the time Smith's demand letter arrived, NBCS and Capital Trust were already litigating against each other.  Johnston Barton has represented NBCS in connection with its disputes against Capital Trust, although it is unclear whether it was involved in that representation concurrently with the Smith matter.  The plaintiff does not allege that he ever believed that he had an attorney-client relationship with Johnston Barton, but he alleges that Johnston Barton told him to not contact Smith's counsel.

The plaintiff alleges that "NBCS looked at Mr. Smith's claim as an opportunity to exact some form of revenge against Mr. Pagliara.  It saw an opportunity to harm his reputation and to damage his 27-year spotless regulatory record, and it seized the opportunity."  (*Id.* ¶ 22.)  NBCS allegedly took this revenge by settling Smith's potential claims for $30,000.

As a licensed securities broker, Pagliara is periodically required to file Form U-4 with the Financial Industry Regulation Authority.  That form asks whether the broker has been the subject of a consumer complaint that was settled for more than $15,000.  Because of NBCS's $30,000 settlement, Pagliara will allegedly "now and for the remainder of his career" be required to disclose the settlement; this will "harm[] his reputation in the securities community and make[] it more difficult to attract clients."  (*Id.* ¶ 31.)  The plaintiff contends that Smith's potential claims were legally baseless and that, in any event, all but $16,000 of Smith's losses were mitigated,

4

making the $30,000 settlement excessive. He alleges that the settlement "had nothing to do with the merits of Mr. Smith's claim but rather had everything to do with the desire to harm Mr. Pagliara and his reputation." (*Id.* ¶ 28.) Both NBCS and Johnston Barton allegedly intended to harm the plaintiff.

The plaintiff alleges that, pursuant to the License Agreement, NBCS initially planned to seek indemnity from Capital Trust for the costs of defending the Smith claims and for any damages eventually paid. But, after settling, and after allegedly consulting additional counsel, NBCS decided to not seek indemnification. Thus, neither the plaintiff nor Capital Trust paid anything in connection with the Smith settlement. The settlement did not cover any potential claims by Smith against Pagliara or Capital Trust.

The plaintiff initially filed this case in Tennessee state court, and the defendant removed it to this court on diversity grounds. (*See* Docket No. 1.) The Complaint asserts three causes of action: (1) breach of fiduciary duty, because Johnston Barton "failed to protect Mr. Pagliara's interests and actively harmed his interests" (Docket No. 1, Ex. 1 ¶ 43); (2) violation of the Tennessee Consumer Protection Act; and (3) "intentional infliction of harm."

## ANALYSIS

The defendant has filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12, arguing that this court has no personal jurisdiction over it and that the plaintiff has failed to state a claim for relief.

## I.    Personal Jurisdiction

As a threshold matter, the defendant argues that, because the defendant lacks sufficient

contacts with Tennessee, this court cannot exercise personal jurisdiction over it. (Docket No. 9 at 6-16.) Federal Rule of Civil Procedure 12(b)(2) permits a defendant to move to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2).

### A.    Legal Standard

The issue of whether the court may exercise personal jurisdiction over the defendant depends on the application of Tennessee's long-arm statute, Tenn. Code Ann. § 20-2-214. The long-arm statute has been consistently construed to extend to the limits of federal due process, however, so the two inquiries are merged, and the court need only determine whether exercising personal jurisdiction over the defendant is consistent with federal due process requirements. *Id.* § 20-2-214(a)(6); *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 477 (6th Cir. 2003).

In order for due process to permit the exercise of personal jurisdiction over a non-resident defendant, the defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.*, 324 F.3d 409, 417-18 (6th Cir. 2003) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct bases for personal jurisdiction. Specific jurisdiction exists when a state exercises personal jurisdiction over a defendant in a suit that is related to the defendant's contacts with the forum. *Id.* General jurisdiction, on the other hand, exists when a defendant's contacts with the forum are "substantial" and "continuous and systematic," even if

the contacts are unrelated to the suit at hand.[6]  *Id.*

In *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir. 1968), the Sixth Circuit established a three-part test for determining whether the exercise of specific jurisdiction is consistent with the principles of due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.* at 381.

Although a motion to dismiss for lack of specific personal jurisdiction may be maintained based on prongs two and three of the *Mohasco* test, purposeful availment is the *sine qua non*, or absolutely indispensable, element of personal jurisdiction.  *Id.* at 381-82.  Thus, disputes about whether or not there is specific personal jurisdiction in a given case often rise or fall on the issue of purposeful availment.  *See Air Prods. and Controls, Inc. v. Safetech Internat'l, Inc.*, 503 F.3d 544, 550-51 (6th Cir. 2007).  "A defendant has 'purposefully availed' himself of a forum by engaging in activity that should provide 'fair warning' that he may have to defend a lawsuit there."  *Youn*, 324 F.3d at 418 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286,

---

[6] The parties dispute the existence of both types of jurisdiction.  As explained below, however, the court finds that specific jurisdiction exists here, so it is unnecessary to consider whether general jurisdiction also exists.  The parties further dispute whether the court has transitory jurisdiction over the defendant because a Johnston Barton partner was served with process while in Tennessee.  (*See* Docket No. 19 at 6-8; Docket No. 23 at 3-6.)  Again, because specific jurisdiction is proper, the court need not resolve this issue.

7

297 (1980)); *see also Bridgeport*, 327 F.3d at 478 (describing purposeful availment as "something akin to . . . conduct which can be properly regarded as a prime generating cause of the effects resulting in [the forum state]" (quotation marks omitted) (alteration in original)); *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) (considering whether the defendant's actions "had foreseeable effects in Tennessee and were directed at individuals in Tennessee"). The defendant himself must have created the contacts with the forum state. *Bridgeport*, 327 F.3d at 478. This "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous' or 'attenuated' contacts or of the 'unilateral activity of another party or third person.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

### B. Application of the *Mohasco* Standard

First, the court finds that Johnston Barton purposefully availed itself of Tennessee because it represented NBCS in a dispute that was inextricably tied to Tennessee. The basic facts relevant to the personal jurisdiction inquiry are undisputed. The defendant chose to represent NBCS against a potential claim by a Tennessee investor regarding investment advice that was rendered by NBCS's Tennessee branch office, Capital Trust. All of the conduct underlying Smith's threatened claim occurred in Tennessee.[7] It was clearly possible – and, perhaps, probable – that any action eventually filed by Smith would be filed in a Tennessee

---

[7] This distinguishes the instant case from *Biederman v. Schnader, Harrison, Siegal & Lewis*, 765 F. Supp. 1057 (D. Kan. 1991), which the defendant cites and which found that a Pennsylvania law firm was not subject to personal jurisdiction in Kansas for its representation of a Kansas client in an action filed in North Carolina. Nothing in *Biederman* indicated that the underlying dispute was centered in Kansas.

8

court.[8] *Cf. Allen v. James*, 381 F. Supp. 2d 495, 497 (E.D. Va. 2005) (noting that a law firm that represented a client who had a car accident in Virginia "must have been aware . . . that any lawsuit that would be brought pertaining to the car accident would most likely have to be filed in Virginia").

The defendant also knew that its representation would have direct consequences for Tennessee residents. Capital Trust planned to indemnify NBCS for any loss or expenses arising from the claim,[9] and any substantial settlement between NBCS and Smith would have regulatory consequences for Pagliara. Furthermore, the main thrust of the Complaint is that Johnston Barton intended to harm Pagliara by negotiating an inflated settlement of Smith's meritless claim. (Docket No. 1, Ex. 1 ¶ 25.) This allegation supports finding jurisdiction, because the existence of intentional tortious conduct that is directed at a resident of the forum state "'enhances' a party's other contacts with the forum state for purposes of a purposeful availment analysis." *Air Prods.*, 503 F.3d at 552.

In addition, Johnston Barton directed at least several communications related to the Smith matter to Pagliara or his Tennessee-based counsel. The Complaint alleges, and the defendant does not dispute, that "Johnston Barton notified Mr. Pagliara . . . that NBCS intended

---

[8] It is possible, of course, that Johnston Barton would have referred the case to another firm if litigation proceeded in Tennessee. But the plaintiff has submitted interrogatory responses showing that, in the past five years, Johnston Barton has represented at least six clients in cases in Tennessee state or federal court and at least three clients in other types of Tennessee proceedings. (*See* Docket No. 20 ¶¶ 2-3.)

[9] Even though NBCS did not ultimately seek indemnify from Capital Trust, it only decided this after the settlement agreement was executed. Throughout the settlement process, NBCS planned to seek indemnification.

9

to defend the claim and that NBCS would use Capital Trust's funds to pay the costs of defense and to pay any damages awarded." (Docket No. 1, Ex. 1 ¶ 24.) It also alleges that the defendant "instructed Mr. Pagliara not to contact Mr. Smith or his counsel." (*Id.* ¶ 30.)

Taken together, these contacts were enough to provide fair warning to Johnston Barton that it might be required to defend itself in Tennessee from allegations related to the Smith dispute. When a law firm (1) decides to represent a client against claims threatened by a Tennessee resident, (2) knows that the actions underlying the potential claims occurred in Tennessee, (3) knows that its resolution of the matter will directly affect certain Tennessee residents, including an indemnitor, (4) allegedly intends to harm those Tennessee residents, and (5) communicates with those Tennessee residents, the law firm has created contacts with Tennessee sufficient to support specific jurisdiction. *Cf. Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 335 (Tenn. 1985) (finding personal jurisdiction over an out-of-state lawyer who prepared documents related to a Tennessee transaction); *Gomberg v. Shosid*, No. 1:05-cv-356, 2006 U.S. Dist. LEXIS 45785, at *13-14 (E.D. Tenn. July 6, 2006) (same).[10]

---

[10] Johnston Barton argues that *Masada* and *Gomberg* are distinguishable from the instant case. It is true that the facts of those cases are not perfectly on point. In *Masada*, the defendant lawyer drafted legal documents regarding the sale of certain Tennessee real property, and the court found that, "[b]y wilfully and knowingly choosing to prepare legal documents which would be filed in Tennessee and be of great consequence here, [the defendant] purposely availed himself of the privilege of doing business within this state." *Masada*, 697 S.W.2d at 335. Similarly, in *Gomberg*, the defendant law firm performed work that "controll[ed] the sale of certain assets located in Tennessee," and the court found that personal jurisdiction was proper. *Gomberg*, 2006 U.S. Dist. LEXIS 45785, at *22-23.

Instead of real estate transactions, the instant case involves threatened litigation. But the threatened claim covered actions that took place in Tennessee, and Johnston Barton knew that its settlement agreement would directly affect Capital Trust and Pagliara. In light of this, Johnston Barton "should have reasonably anticipated having to defend [its] actions in Tennessee." *Id.* at

10

The defendant emphasizes that it is an Alabama law firm, without any offices in Tennessee, and that NBCS is an Alabama corporation. It further points out that Smith's counsel was located in Florida and that the negotiation and execution of the settlement agreement took place in either Alabama or Florida. (Docket No. 9 at 9-10.) Although true, these facts do not negate the previously described Tennessee contacts.

The defendant cites the Ninth Circuit's decision in *Sher v. Johnson*, 911 F.2d 1357 (9th Cir. Cal. 1990), in which the court held that "[o]ut-of-state legal representation does not establish purposeful availment of the privilege of conducting activities in the forum state, where the law firm is solicited in its home state and takes no affirmative action to promote business within the forum state." *Id.* at 1363. But *Sher*, in addition to not being binding authority on this court, is distinguishable from this case. In *Sher*, a Florida law firm represented a California resident in a criminal trial that took place in Florida. There was no indication that the criminal prosecution involved conduct that took place in California or that the firm's representation would predictably affect any California resident, other than the client. Here, in contrast, the facts underlying the Smith dispute occurred in Tennessee and the resolution of the dispute had direct, predictable (and allegedly calculated) effects on various Tennessee residents.[11] *Cf. Allen*, 381 F. Supp. 2d at

*22.

[11] The defendant also cites *American Life & Casualty Insurance Co. v. First American Title Co.*, 772 F. Supp. 574 (D. Utah 1991). In that case, the defendant New Mexico lawyer had prepared documents regarding a Utah real estate transaction, including closing instructions that the lawyer knew would be delivered to Utah entities. The Utah district court declined to exercise personal jurisdiction, stating: "Attorneys are often asked to perform services for their local clients which services may have some impact in another jurisdiction. To require an attorney to submit to personal jurisdiction in a foreign jurisdiction each time the attorney communicates instructions on behalf of a client does not comport with fundamental fairness." *Id.* at 579. To

11

498 ("[T]he defendants . . . contracted . . . to provide legal representation in connection with a car accident which took place in Virginia.  In so doing, they purposefully availed themselves of the privilege of conducting business in this state.")  Thus, the court finds that Pagliara has met the first prong of the *Mohasco* test.

Pagliara has also met the remaining two elements of the *Mohasco* test.  First, his claims "arise from" the defendant's contacts with Tennessee.  A plaintiff's cause of action arises from a defendant's contacts when it has a "substantial connection" to the contacts, or "where a defendant's contacts with the forum state are related to the operative facts of the controversy." *Tharo Systems, Inc. v. Cab Produkttechnik GMBH & Co.*, 196 Fed. Appx. 366, 371 (6th Cir. 2006) (quotation marks omitted).  Here, the conduct that creates the defendant's contacts with Tennessee – namely, its decision to represent NBCS against Smith and its actions in settling the claim – forms the foundation of the plaintiff's claims.

Second, it is reasonable for the court to exercise personal jurisdiction.  Assessing reasonableness requires the court to balance "'the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief.'"  *Youn*, 324 F.3d at 419 (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 113 (1987)).  Except in "unusual case[s]," if the first two prongs of *Mohasco* are met, the reasonableness prong is presumed to be satisfied.  *Tharo*, 196 Fed. Appx. at 372.  Nothing indicates that this is an unusual case.

_____

the extent that the holding in *American Life* is inconsistent with this court's decision, this court declines to follow *American Life*.  The court similarly declines to follow *Star Technology v. Tultex Corp.*, 844 F. Supp. 295 (N.D. Tex. 1993), another case cited by the defendant, to the extent that it is inconsistent.

12

Tennessee has a clear interest in redressing injuries suffered by its residents, just as Pagliara has an interest in obtaining relief for any damages he has suffered. Although litigating in Tennessee will minimally burden the Alabama-based defendant,[12] this is not the kind of extraordinary burden that can defeat personal jurisdiction when sufficient minimum contacts exist. *See Youn*, 324 F.3d at 420; *Air Prods.*, 503 F.3d at 555.

Because the court finds that it may exercise specific jurisdiction over Johnston Barton, the plaintiff's claims will not be dismissed on personal jurisdiction grounds.

## II. Rule 12(b)(6) Standard

The defendant further argues that the plaintiff has failed to state a valid claim. The Federal Rules of Civil Procedure require plaintiffs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed R. Civ. P. 8(a)(2), and Rule 12(b)(6) allows a defendant to move to dismiss on the grounds that the plaintiff has failed to state a claim. In deciding a Rule 12(b)(6) motion, the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The court must assume that all of the factual allegations are true, even if they are doubtful in fact. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In contrast, legal conclusions are not entitled to the assumption of truth. *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1950 (2009).

---

[12] The court takes judicial notice of the fact that Birmingham, Alabama, where Johnston Barton is located, is approximately 190 miles from Nashville, Tennessee, the situs of this court. This is shorter than the distance between Nashville and many of the far reaches of Tennessee.

13

Generally, a complaint does not need to contain "detailed factual allegations," although its allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Blanket assertions" or a "formulaic recitation of the elements of a cause of action" are not sufficient. *Twombly*, 550 U.S. at 555, 556 n.3. In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). The factual allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949-50. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

## III.    Breach of Fiduciary Duty Claim

In his Complaint, the plaintiff alleges that Johnston Barton breached a fiduciary duty to him when it assisted NBCS in settling the Smith claim for $30,000, because it knew and intended that this would blemish Pagliara's regulatory record. The plaintiff does not allege or argue, however, that he had an attorney-client relationship with Johnston Barton.

The defendant argues that Pagliara has provided no legal authority for the existence of a lawyer's fiduciary duty to nonclients. (*See* Docket No. 9 at 22-26; Docket No. 23 at 9-13.) In his brief, the plaintiff cites a number of cases holding that, in certain circumstances, a lawyer can owe a professional duty to nonclients. (*See* Docket No. 19 at 13-21.) But each of these cases involve the extension of a *duty of care*; in each case, the defendant lawyer harmed the nonclient plaintiff through the lawyer's negligence. *See, e.g.*, *Stinson v. Brand*, 738 S.W.2d 186 (Tenn. 1987) (lawyer negligently drafted deeds); *Collins v. Binkley*, 750 S.W.2d 737 (Tenn. 1988)

14

(same); *Paradigm Ins. Co. v. Langerman Law Offices, P.A.*, 24 P.3d 593 (Ariz. 2001) (lawyer negligently failed to research an insured's coverage from other insurers); *Credit Gen. Ins. Co. v. Midwest Indem. Corp.*, 872 F. Supp. 523 (N.D. Ill. 1995) (lawyer negligently handled litigation, resulting in large verdict); *R. J. Longo Constr. Co. v. Schragger*, 527 A.2d 480 (N.J. Super. Ct. App. Div. 1987) (lawyer negligently drafted a contract). None of these cases involved a lawyer who breached a duty of loyalty or fidelity to the nonclient by taking actions that intentionally harmed the nonclient.

The Complaint is clear that the defendant is not accused of being merely negligent during the settlement process. Instead, it repeatedly alleges that the defendant *intended* to harm Pagliara:

> "Johnston Barton and NBCS thereafter negotiated [a $30,000 settlement] agreement . . . in a transparent attempt to harm Mr. Pagliara and his reputation." (Docket No. 1, Ex. 1 ¶ 25.)

> "The decision to settle Mr. Smith's claim for $30,000 had nothing to do with the merits of Mr. Smith's claim but rather had everything to do with the desire to harm Mr. Pagliara and his reputation." (*Id.* ¶ 28.)

> "Johnston Barton was aware . . . that any settlement of the Smith claim in excess of $15,000 would require [regulatory] disclosure [by Pagliara]." (*Id.* ¶ 36.)

> "[Johnston Barton] knowingly negotiated and recommended a settlement that it knew would damage Mr. Pagliara's spotless 27-year regulatory record. It did so in cooperation with its client, NBCS, which was eager to harm Mr. Pagliara." (*Id.* ¶ 39.)

This means that the plaintiff misses the mark with his lengthy discussion of cases that extend a lawyer's duty of care to nonclients. The plaintiff has simply not alleged that Johnston Barton

15

has breached a duty of care.[13]

The defendant argues that no fiduciary duty can exist from a lawyer to a nonclient. Johnston Barton quotes the treatise *Legal Malpractice* for the propositions that "the predicate of the attorney's fiduciary obligations is the existence of an attorney-client relationship" and that "[a] fiduciary relationship requires more than the status of being an attorney or someone else's attorney." Mallen, Ronald E. & Jeffrey M. Smith, 2 Legal Malpractice § 15:3 (2009). That treatise also notes that "[t]he developing concept of expanded privity, resulting in an attorney's liability for negligence to one other than the client, has not included an attorney's fiduciary obligations." *Id.* The defendant cites non-Tennessee cases that have refused to find the existence of fiduciary duties to nonclients. *E.g.*, *Estate of Leonard v. Swift*, 656 N.W.2d 132, 144 (Iowa 2003); *see also* Restatement (Third) of the Law Governing Lawyers § 49 (2000) (noting that a lawyer "is liable *to a client* if the lawyer breaches a fiduciary duty *to the client*" (emphasis added)).

Nevertheless, the court finds that a lawyer can, in some circumstances, owe limited fiduciary duties to nonclients. Tennessee's common law recognizes two types of fiduciary relationships: those that are fiduciary *per se*, such as attorney-client relationships, and those in which one party has exercised "dominion and control" over another party.[14] *Condo. Mgmt.*

---

[13] Such a claim would exist if, for example, NBCS intended to settle the Smith claim for $10,000 but Johnston Barton erroneously listed $30,000 on the settlement agreement, or if Johnston Barton negligently advised NBCS that the merits of Smith's claim warranted a large settlement.

[14] The parties do not address which state's substantive law should govern this dispute. It appears that they assume that Tennessee law controls, so the court will apply Tennessee law.

16

*Assocs. v. Fairway Vill. Owner's Ass'n*, No. W2009-00688-COA-R3-CV, 2010 Tenn. App.

LEXIS 105, at *20 (Tenn. Ct. App. Feb. 8, 2010). The latter type of relationship is often called a

"confidential relationship," where "confidence is placed by one in the other and the recipient of

that confidence is the dominant personality, with ability, because of that confidence, to influence

and exercise dominion and control over the weaker or dominated party." *Id.* (quotation marks

and citations omitted). "[C]ourts have been hesitant to define precisely what a confidential

relationship is and the court must look to the particular facts and circumstances of the case to

determine whether one party exercised dominion and control over another, weaker party." *Id.* at

*21 (quotation marks omitted).

     Courts from other states have recognized that this type of confidential relationship can

exist between a lawyer and a nonclient. *E.g.*, *Chem-Age Indus. v. Glover*, 652 N.W.2d 756, 772

(S.D. 2002); *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 78 (Tex. App. 2004);

*Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P. C.*, 309 N.W.2d 645, 648 (Mich. Ct.

App. 1981). This type of fiduciary relationship is also recognized in the Mallen & Smith

treatise. *See Legal Malpractice* § 15:3 ("A fiduciary relationship can exist if a person is entitled

to place trust and confidence in another, who may happen to be a lawyer."). In *Chem-Age*, for

example, the defendant lawyer created a corporation for his client. The client then

misappropriated funds from the corporation's investors, giving some of the money to the lawyer.

*Chem-Age*, 652 N.W.2d at 761. The nonclient investors sued the lawyer for breach of fiduciary

duty. The South Dakota Supreme Court stated that a fiduciary relationship would exist if: (1) the

plaintiffs reposed faith, confidence, and trust in the lawyer; (2) they were in a position of

17

inequality, dependence, weakness, or lack of knowledge; and (3) the lawyer exercised dominion, control, or influence over plaintiffs' affairs. *Id.* at 772. Because there was no evidence that the plaintiffs depended on the lawyer to protect their investments, however, the court found that no fiduciary relationship existed. *Id.* at 773.

Here, the allegations of the Complaint, if true, are sufficient to create at least a limited fiduciary relationship. By relinquishing control of the defense of Smith's claim to Johnston Barton, Pagliara reposed his faith in, and became dependent on, the firm to handle the defense in good faith. Indeed, NBCS demanded that it be allowed to retain its own counsel, so Pagliara was effectively forced to become dependent on Johnston Barton.[15] Furthermore, because any settlement over $15,000 would necessarily affect Pagliara's regulatory record, and because Johnston Barton allegedly instructed Pagliara to not contact Smith during the settlement process, it is clear that the firm exercised some amount of control over Pagliara's affairs.

This created a fiduciary duty on the part of Johnston Barton to undertake NBCS's defense in good faith and to not intentionally and gratuitously harm Pagliara. To be clear, the court is not holding that the defendant owed a duty of loyalty to Pagliara that would conflict with the defendant's legitimate exercise of any duty to its client, NBCS. *Cf. In re Youngblood*, 895 S.W.2d 322, 328 (Tenn. 1995) ("The employment of an attorney by an insurer to represent the

---

[15] The plaintiff alleges that NBCS asserted its "exclusive right under the License Agreement to defend the claim." (Docket No. 1, Ex. 1 ¶ 23.) The source of this exclusive right is unclear. Although the License Agreement provides that NBCS shall have the right to settle claims without Capital Trust's prior approval, it also provides that Capital Trust "*shall . . . defend . . .* NBCS from and against any and all claims." (Docket No. 9, Ex. 1 ¶ 6.) In any event, the parties do not dispute that NBCS demanded that it be allowed to retain its own counsel.

18

insured does not . . . necessarily impose upon the attorney any duty or loyalty to the insurer which impairs the attorney-client relationship between the attorney and the insured or impedes the performance of legal services for the insured by the attorney.").  If the evidence ultimately shows that Johnston Barton negotiated the settlement in good faith and that the settlement was a reasonable compromise of Smith's claim, then the firm will have discharged its duty to Pagliara.  But if the defendant worked in concert with its client to purposely inflate the settlement amount beyond the actual value of the claim, with the intention of blemishing Pagliara's regulatory record, the plaintiff may recover his damages.

The defendant argues that Tennessee's litigation privilege bars the plaintiff's claims.  (Docket No. 9 at 16-20.)  It relies on the recent case of *Unarco Material Handling, Inc. v. Liberato*, No. M2009-01603-COA-R3-CV, 2010 Tenn. App. LEXIS 161 (Tenn. Ct. App. Mar. 2, 2010), which expanded the application of the privilege.  Traditionally, the litigation privilege shielded lawyers from liability for defamatory statements made in the context of litigation.  *See id.* at *14.  In *Unarco*, the defendant lawyer sought testimony from a witness that would breach a nondisclosure agreement between the witness and his employer.  *Id.* at *4.  The lawyer drafted an indemnity agreement providing that the client would indemnify the witness for any breach of the nondisclosure agreement.  *Id.*  The employer sued the lawyer for tortious interference, and the court extended the litigation privilege to shield the lawyer from liability.  *Id.* at *32-33.  But the court limited the privilege to situations in which a lawyer did not employ "wrongful means," including fraud.  *Id.* at *33.  Thus, a lawyer cannot use the privilege as a shield against his own participation in fraud.

19

The situation alleged – of settling a baseless consumer complaint for an intentionally inflated amount, specifically so that a disfavored securities broker will be forced to file a harmful regulatory disclosure – strikes the court as a species of fraud.[16] *Cf. Rivet v. State Farm Mut. Auto. Ins. Co.*, 316 Fed. Appx. 440, 445 (6th Cir. 2009) (affirming judgment against attorney who conspired with the plaintiff insurer's claims agent to reach fraudulently large settlements and stating that "there is a line between zealous representation and aiding and abetting fraud"). If the plaintiff eventually proves that Johnston Barton has engaged in such conduct, the litigation privilege announced in *Unarco* will not shield the law firm from liability.[17]

The defendant further argues that the License Agreement between NBCS and Capital Trust gave NBCS the unfettered right to settle the Smith claim. (Docket No. 9 at 20-21.)

_____

[16] The parties have not submitted the Smith settlement agreement itself, so it is unclear whether the agreement contains any statements that could be considered fraudulent.

[17] Furthermore, to the extent that negotiating and drafting an intentionally inflated settlement is fraud, participating lawyers are not absolved simply because they were representing a client. The Restatement provides that "a lawyer is subject to liability to a client or nonclient when a nonlawyer would be in similar circumstances." Restatement (Third) of the Law Governing Lawyers § 56. The comments to Section 56 further explain:

> When a lawyer advises or assists a client in acts that subject the client to civil liability to others, those others may seek to hold the lawyer liable along with or instead of the client. Whether a lawyer is liable depends on the elements of liability under the law upon which the claim of liability is predicated and may therefore turn on such factors as how the lawyer's acts contributed to the plaintiff's harm, what the lawyer knew or believed as to the relevant facts and law, the lawyer's intent, and how culpable the client's conduct is under the law.

*Id.* cmt. c; *see also id.* § 94(1) ("A lawyer who counsels or assists a client to engage in conduct that violates the rights of a third person is subject to liability . . . to the third person . . . .").

20

Because NBCS was allegedly determined to settle the Smith claim, the defendant argues, no law firm could have done anything to prevent the settlement, and Pagliara's claims fail for lack of proximate cause. (*Id.*; Docket No. 23 at 13-14.) It is true that the License Agreement grants NBCS the right to settle the claim "without the prior approval" of either Capital Trust or Pagliara. But the agreement does not give NBCS the right to enter into settlements that are independently tortious – for example, fraudulently inflated settlements that are calculated to harm third parties. Nor is proximate cause on Pagliara's claims absent because the defendant merely assisted NBCS in reaching a fraudulent settlement. *See* Restatement (Third) of the Law Governing Lawyers § 94(1) ("A lawyer who counsels or assists a client to engage in conduct that violates the rights of a third person is subject to liability . . . to the third person . . . .").

Accordingly, the court will not dismiss the plaintiff's breach of fiduciary duty claim.

## IV. The Plaintiff's Remaining Claims

The plaintiff has also asserted a claim under the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 *et seq.*, alleging that the defendant violated the Act by advising Pagliara to not contact Smith and then settling the Smith claim on terms that were harmful to Pagliara.

The defendant argues that, because the TCPA only applies to consumer transactions in trade or commerce, *see Crossley Constr. Corp. v. Nat'l Fire Ins. Co.*, 237 S.W.3d 652, 657 (Tenn. Ct. App. 2007), it does not apply to Johnston Barton's conduct. Indeed, the District Court for the Eastern District of Tennessee has held that "the TCPA does not apply to lawyers practicing law because the practice of law is a profession and is not trade or commerce as

21

defined in the TCPA." *Schmidt v. Nat'l City Corp.*, No. 3:06-CV-209, 2008 U.S. Dist. LEXIS 16761, at *8 (E.D. Tenn. Mar. 4, 2008).

In response, the plaintiff cites *Constant v. Wyeth*, 352 F. Supp. 2d 847 (M.D. Tenn. 2003), which noted that professionals do not enjoy blanket immunity from TCPA claims. Rather, the court held, "they are only immune when the plaintiff's allegations concern the actual provision of [professional] services." *Id.* at 854 n.10. Thus, professionals such as doctors or lawyers can be held liable under the TCPA for "'allegations of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of the entrepreneurial, commercial, or business aspect of [their] practice.'" *Id.* (quoting *Nelson v. Ho*, 564 N.W.2d 482, 486 (Mich. Ct. App. 1997)); *see also Proctor v. Chattanooga Orthopaedic Group, P.C.*, 270 S.W.3d 56, 57 (Tenn. Ct. App. 2008) (holding that the TCPA "can apply to the entrepreneurial, commercial, or business aspects of a medical practice").

The plaintiff argues that the TCPA applies here because Johnston Barton "was motivated, at least in part, to act deceptively toward the plaintiff in order to satisfy NBCS and its principals, for whom the defendant derives substantial revenues." (Docket No. 19 at 27.) Regardless of the defendant's motives, however, the claim is based on the defendant's conduct in settling the Smith claim. When a lawyer negotiates and drafts a settlement agreement, the lawyer is undoubtedly practicing law, even if he or she acts negligently or otherwise tortiously. Accordingly, the TCPA does not apply to the defendant's conduct, and the plaintiff's TCPA claim will be dismissed. *Cf. Constant*, 352 F. Supp. 2d at 854 ("[M]edical malpractice claims may not be recast as consumer protection act claims.").

Finally, the plaintiff asserts a claim styled as "intentional infliction of harm," alleging simply that Johnston Barton intentionally participated in conduct that it knew would harm Pagliara. (Docket No. 1, Ex. 1 ¶¶ 51-53.) The defendant correctly argues, and the plaintiff does not dispute, that Tennessee does not recognize "intentional infliction of harm" as a tort. (Docket No. 9 at 27.) This claim will also be dismissed.

## CONCLUSION

For all of the reasons discussed above, the court will grant in part and deny in part the defendant's Motion to Dismiss. The plaintiff's TCPA and "intentional infliction of harm" claims will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge