# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| TIMOTHY PAGLIARA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:10-cv-00679** |
| v. | ) | |
| | ) | **Judge Sharp** |
| JOHNSTON BARTON | ) | |
| PROCTOR & ROSE, LLP, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Defendant Johnston Barton Proctor & Rose, LLP ("Defendant" or "Johnston Barton") filed a Motion for Summary Judgment (Docket Entry No. 44), to which Plaintiff Timothy Pagliara ("Plaintiff" or "Pagliara") filed a response in opposition (Docket Entry No. 54), and Defendant filed a reply (Docket Entry No. 59).

## FACTUAL BACKGROUND

Plaintiff is a licensed securities broker.[1]  At all times relevant to this litigation, he was a partner of PMW Partners, which does business in Tennessee under the name Capital Trust Wealth Management Group ("Capital Trust").   In 2002, Plaintiff and Capital Trust began working with NBC Securities, Inc. ("NBCS"), an Alabama-based securities firm.  Capital Trust and NBCS signed a Branch Office License Agreement (the "License Agreement"), which, as the name suggests, provided that Capital Trust would become a Tennessee branch office of NBCS.

---

[1] The following recitation is drawn primarily from Defendant's Statement of Undisputed Material Facts and Plaintiff's responses thereto, the Complaint (Docket Entry Nos. 1-1 and 55) and related exhibits.  Plaintiff incorporated his facts in the *Memorandum in Opposition to Motion for Summary Judgment* (Docket Entry No. 54), instead of in a separate filing as contemplated by Local Rule 56.01(b).  In any event, and based upon the record, the specific facts set forth in this Court's summary appear to be a fair characterization of the facts relevant to the issues presented in the filings.

The License Agreement was executed by Bradford Phelan ("Phelan"), as President, on behalf of NBCS and Plaintiff, among others, on behalf of Capital Trust. (Docket Entry No. 47 at Exh. B).

Eventually, there was a falling out between Capital Trust and NBCS, wherein ongoing "protracted litigation" between the parties ensued. Defendant, Johnston Barton, is a Birmingham, Alabama, law firm, who was initially hired to represent NBCS in connection with the litigation.

In late 2009 or early 2010, NBCS received a complaint from one of Plaintiff's longtime clients, Philip Butler ("Butler"). Butler had requested advice on how to invest a $100,000.00 certificate of deposit that was about to mature. In March 2008, Plaintiff, working as a registered representative of NBCS, invested $98,315.00 of Butler's funds in three different bank stocks: Bank of America Corp., Regions Financial Corp., and Fifth Third Bankcorp. Before long, the financial crisis occurred, and by the end of the year, the value of the bank stocks had fallen precipitously. This investment formed the basis of Butler's complaint against NBCS and Plaintiff.

On January 20, 2010, Butler's counsel, Jonathan Butler ("J. Butler")[2], sent a demand letter to NBCS and copied Plaintiff on it.[3] Upon receipt of the Butler letter in January of 2010, NBCS contacted its counsel, Kurt Miller ("Miller"), at Johnston Barton to handle the potential claim. On January 21, 2010, Miller e-mailed J. Butler to inform him of his engagement. Plaintiff also had his own attorney, but neither he nor his counsel was involved in the defense or settlement of the Butler claim. (Docket Entry No. 56-11, Pagliara 5/25/11 Dep. at p. 191).

---

[2] Jonathan Butler is Philip Butler's son.

[3] J. Butler testified that he also drafted a letter dated November 11, 2009, but "it is very possible" the letter was never sent prior to being included with the January 2010 letter. Nevertheless, Plaintiff did not receive the November 2009 letter.

2

Shortly after receipt of the Butler demand and in accordance with its internal policies, NBCS asked Plaintiff to provide all documents related to the Butler portfolio and a written statement responding to the issues raised in the demand, and instructed Plaintiff that he was not to have contact with Butler about the claims.[4]

After receiving the Butler demand, Plaintiff contacted Butler directly and offered to settle all claims against himself and NBCS for just below $15,000.00.[5] Butler declined. When Defendant became aware of such interaction, Miller instructed Plaintiff, through counsel, that Plaintiff's actions "violate[d] FINRA's policies, violate[d] NBC's instructions to [him] that NBC would resolve this matter, and conflict[ed] with Mr. Pagliara's assertion that this matter should not be settled." (Docket Entry No. 56-2).

The License Agreement between Capital Trust and NBCS contains an indemnity provision:

> [Capital Trust] shall indemnify, defend and hold harmless NBCS from and against any and all claims or actions and all costs, expenses, losses, damages and liabilities . . . arising out of the affiliation of [Capital Trust] . . . . NBCS, at its sole option and without the prior approval of either [Capital Trust] or the applicable Representative, may settle or compromise any claim at any time. [Capital Trust] does not indemnify NBCS for any liability arising from NBCS' own acts or omissions.

---

[4] As it was required to do under FINRA rules and regulations, NBCS filed a Form U-5 reporting the threatened claims to FINRA. Likewise, Plaintiff, as he was required to do under FINRA rules and regulations, filed an amended Form U-4 for himself reporting that he had been the subject of a written demand for in excess of $15,000.00 based on his conduct.

[5] Plaintiff proposed an amount below $15,000.00 because his "compliance people had told [him] that if it was settled for less than [that amount], it would go away and would not be part of [his] record." (Docket Entry No. 56-10, Pagliara 4/5/11 Dep. at p. 99). According to Plaintiff, this was the first complaint by a customer "in the plus 27 years that [he had] been in the industry." (*Id.*).

(Docket Entry No. 47 at Exh. B).  On February 4, 2010, Plaintiff e-mailed a letter to NBCS notifying NBCS that Capital Trust intended to defend Butler's claims in arbitration and stated, "[w]e object to any payment by NBC Securities, Inc. to settle this frivolous claim."[6]

To evaluate Butler's claims, NBCS and Miller reviewed the Butler demand, Plaintiff's rebuttal to that letter, and the documents in the client's file.[7]  According to Defendant, as NBCS's counsel, Miller of Johnston Barton, had several discussions with NBCS in which he advised the firm regarding the risks that it faced, the legal positions of the parties, the legal defenses it might have if the Butler claim went to arbitration, and the costs of proceeding to arbitration. After assessing Butler's claims, NBCS purportedly decided to seek a reasonable settlement.  NBCS's first settlement offer to Butler was allegedly $15,000.00.  Butler, through his attorney, categorically rejected this offer. (Docket Entry 47-20, Miller Dep. p. 68-69).

On May 10, 2010, NBCS settled the Butler claim for $30,000.00.  (Docket Entry No. 47-27 and Docket Entry No. 47-3, Wilkins Dep. at p. 159).  Plaintiff was not involved in the negotiation process or made a party to the settlement.  Phelan, however, was involved in the decision to settle the Butler demand and ultimately it was Phelan who made the decision that NBCS would settle with Butler for $30,000.00.

Plaintiff had previously told Butler directly that he would never settle for or above the reporting threshold of $15,000.00 and further informed Butler he would not be a party to a settlement in excess of the $15,000.00 FINRA reporting threshold.  It is Plaintiff's belief that "NBCS looked at Mr. [Butler]'s claim as an opportunity to exact some form of revenge against

---

[6]   Defendant also alleges that Plaintiff offered to personally defend and indemnify NBCS against all expenses and liabilities that may arise from the Butler complaint if NBCS would refuse to settle the case.  Plaintiff denies having made such an offer.

[7]   No rules require it, but it is common practice to make a record in a client's file when a client agrees to an investment recommendation that appears to differ from the risk tolerances and objectives noted in an account opening form.

4

Mr. Pagliara. It saw an opportunity to harm his reputation and to damage his 27-year spotless regulatory record, and it seized the opportunity." (Docket Entry No. 1-1 at ¶ 22).

According to Phelan, he "gave no thought to Mr. Pagliara's reporting obligations in connection with any such settlement." (Docket Entry No. 47-22, Phelan Dep. at p. 30). Phelan testified in his deposition as follows:

> Q. Why in your view was the thirty thousand dollar settlement reasonable?
>
> A. Well, looking at the -- the cost to defend it and looking at the uncertainty of what an arbitration panel might decide one way or the other, and considering that we were in a dispute with Mr. Pagliara and the possibility of us being in dispute, kind of being levered by the other side, perhaps, increasing our risk of trying to have a favorable settlement, I thought it was -- you know, it's not a big number, and so I thought it was reasonable based on our experience.

(Phelan Dep. at p. 28). Miller testified that the settlement with Butler was not intentionally negotiated or arrived at in any manner to achieve a result harmful to Plaintiff. Similarly, Butler's counsel testified about the settlement as follows:

> Q. Do you believe that that settlement was a fair settlement of your father's claims against NBC Securities?
>
> A. I would state that it is on the low end of a fair settlement. That Mr. Butler could have pursued a higher number, could have been more aggressive. But in order to avoid, you know, protracted litigation or arbitration he agreed to accept that sum and potentially preserve his claims against Mr. Pagliara for additional sums. But to answer your question, I believe it was a fair and reasonable settlement from -- a very good settlement from NBC's perspective. Maybe less so from Mr. Butler's perspective."

(Docket Entry No. 47-6, J. Butler Dep. at p. 118-119).

Butler's counsel found Miller to be professional and interested in addressing the issue. When asked during his deposition if he was aware of any bad faith on the part of Johnston Barton's Kurt Miller, Butler's lawyer testified:

> A. No, sir. No evidence of any bad faith. And I would dispute that that were

5

(*sic*) the case. The simple reality is that there was never going to be a
settlement of Mr. Butler's claims against either NBC -- collectively
against NBC and Mr. Pagliara for less than the reportable amount. We
would be in FINRA arbitration right now. Mr. Butler pretty clearly told
Mr. Pagliara $14,999 was not going to be an acceptable settlement from
anybody in this case.

According to Defendant, it was Miller's intent, when he agreed on NBCS's behalf to settle Butler's claim for $30,000.00, that any claims against Pagliara would also be released as part of that settlement. (Miller Dep. at p. 32). Butler's counsel testified that Miller called him after the $30,000.00 agreement was reached and expressed that he (Miller) had believed the $30,000.00 would be a full and final settlement and would wrap up the whole matter – including claims against Pagliara. (J. Butler Dep. at p. 108-109). Contrary to Defendant's assertion, Plaintiff argues that even the first draft of the Settlement Agreement that Miller provided to J. Butler excluded Pagliara from the release.

Shortly after the settlement, NBCS amended its Form U-5 filing to reflect the settlement reached with Butler. NBCS's amended Form U-5 filing explicitly stated that the settlement did not include any claims against Pagliara. Pagliara had 30 days from time of settlement to report it on his Form U-4. On March 30, 2011, nearly eleven months after NBCS settled with Butler, Pagliara amended his Form U-4 to disclose for the first time that NBCS had settled with Butler for $30,000.00.

Phelan testified that although the License Agreement gave NBCS the express right to request indemnity from Pagliara for the settlement amount, NBCS ultimately determined not to seek reimbursement from Pagliara for any portion of its settlement with Butler since the settlement did not include Pagliara and was only a settlement of any claims against NBCS. (Phelan Dep. at p. 32-33). Plaintiff alleges, on the other hand, that pursuant to the License Agreement, NBCS initially planned to seek indemnity from Capital Trust for the costs of

6

defending the Butler claims and for any damages eventually paid. But, after settling, and after allegedly consulting additional counsel, NBCS decided to not seek indemnification. Thus, neither Plaintiff nor Capital Trust paid anything in connection with the Butler settlement.[8]

Based on these events, Plaintiff filed suit in the Williamson County Chancery Court. Defendants removed the suit to this Court based upon diversity jurisdiction.

On October 16, 2010, the Court entered an Order and Memorandum ("Judge Trauger Memorandum Opinion") granting in part and denying in part Defendant's motion to dismiss. *See* (Docket Entry Nos. 27-28). The Court dismissed Plaintiff's claims for violations under the Tennessee Consumer Protection Act and for "intentional infliction of harm." The Court did not dismiss Plaintiff's breach of fiduciary duty claim, holding that the allegations of the Complaint, if true, "are sufficient to create at least a limited fiduciary duty." (Docket Entry No. 27 at 18).

## ANALYSIS

Plaintiff now asserts a single claim for breach of fiduciary duty. He alleges Defendant breached a duty owed to him, wherein the evidence shows (1) lack of good faith, (2) the settlement was not a reasonable compromise, and (3) intent to harm Plaintiff. (Docket Entry No. 54 at 15-17). Defendant has moved for summary judgment on this claim.

### I.     Summary Judgment Standard

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of

---

[8] In Plaintiff's *Memorandum in Opposition to Motion for Summary Judgment*, Plaintiff makes mention that Butler is a disbarred Florida attorney who, on March 26, 1998, was convicted of bribery, conspiracy to commit bribery, and 3 counts of unlawful contribution. *See* (Docket Entry No. 54). The Court has made note of this accusation; however, it holds no significance to the Court's analysis herein.

7

Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     Breach of Fiduciary Duty Claim

> A fiduciary relationship arises when one person reposes special trust and confidence in another person and that other person—the fiduciary—undertakes to assume responsibility for the affairs of the other party. The person upon whom the trust and confidence is imposed is under a duty to act for and to give advice for the benefit of the other person on matters within the scope of the relationship.

*Overstreet v. TRW Commercial Steering Div.,* 256 S.W.3d 626, 641–42 (Tenn. 2008) (Koch, J., concurring) (footnotes omitted) (citing *McRedmond v. Estate of Marianelli,* 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000); Restatement (Second) of Torts § 874 cmt. a (1979)). "Proof of damages

is an essential element of" a fiduciary duty claim, *Union Planters Bank of Middle Tenn. v. Choate,* No. M1999–01268–COA–R3–CV, 2000 WL 1231383, at *3 (Tenn. Ct. App. Aug. 31, 2000), as is causation of damages. *See* Restatement (Second) of Torts § 874 ("One standing in a fiduciary relation with another is subject to liability to the other for harm *resulting from* a breach of duty imposed by the relation."  23 Tennessee Practice *Elements of an Action* § 8:1 (2009) (including damages and proximate cause as elements to the cause of action for fiduciary duty).

"Under Tennessee common law, there are two principal types of fiduciary status." *Foster Bus. Park, LLC v. Winfree,* No. M2006-02340-COA-R3-CV, 2009 WL 113242, at *12 (Tenn. Ct. App. Jan. 15, 2009) (citing Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 6.13, at 504 (2006)).  "The first category of common law fiduciary status consists of relationships that are fiduciary *per se* ... such as between a guardian and ward, an attorney and client, or conservator and incompetent." *Id.* (citing *Kelly v. Allen,* 558 S.W.2d 845, 848 (Tenn. 1977); *Mitchell v. Smith,* 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989); *Parham v. Walker,* 568 S.W.2d 622, 625 (Tenn. Ct. App. 1978)).

A relationship which is not fiduciary *per se* may become a fiduciary relationship where one party has exercised "'dominion and control over another.'" *Id.* (quoting *Kelley v. Johns,* 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002)). "This relationship, often called a 'confidential relationship,' 'is not merely a relationship of mutual trust and confidence, but rather it is one 'where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.'" *Id.* (quoting *Kelley,* 96 S.W.3d at 197; *Iacometti v. Frassinelli,* 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973)); *see also Roberts v. Chase,* 25 Tenn.App. 636, 166 S.W.2d 641, 650-51 (Tenn. Ct. App. 1942).  "Relationships that

9

are not fiduciary *per se* 'require proof of the elements of dominion and control in order to establish the existence of a confidential relationship.' " *Id.* (quoting *Kelley,* 96 S.W.3d at 197). "Because confidential relationships can assume a variety of forms, the courts have been hesitant to define precisely what a confidential relationship is and the court must look to the particular facts and circumstances of the case to determine whether one party exercised dominion and control over another, weaker party." *Id.* at *13 (citing *Roberts v. Roberts,* 827 S.W.2d 788 (Tenn. Ct. App. 1991)).

As the Court states in the Memorandum Opinion, courts from other states have recognized that this type of confidential relationship can exist between a lawyer and a nonclient. *See* e.g., *Chem-Age Indus. v. Glover*, 652 N.W.2d 756, 772 (S.D. 2002); *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 78 (Tex. App. 2004); *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P. C.*, 309 N.W.2d 645, 648 (Mich. Ct. App. 1981). This type of fiduciary relationship is also recognized in the Mallen & Smith treatise. *See Legal Malpractice* § 15:3 ("A fiduciary relationship can exist if a person is entitled to place trust and confidence in another, who may happen to be a lawyer."). (Docket Entry No. 27 at 17).

### A. Limited Fiduciary Relationship

In the present case, the Court previously opined that "the allegations of the Complaint, if true, are sufficient to create at least a limited fiduciary relationship." (Docket Entry No. 27 at 18). The Court further added:

> By relinquishing control of the defense of [Butler]'s claim to Johnston Barton, Pagliara reposed his faith in, and became dependent on, the firm to handle the defense in good faith… [f]urthermore, because any settlement over $15,000 would necessarily affect Pagliara's regulatory record, and because Johnston Barton allegedly instructed Pagliara to not contact [Butler] during the settlement process, it is clear that the firm exercised some amount of control over Pagliara's affairs.

10

> This created a fiduciary duty on the part of Johnston Barton to undertake NBCS's defense in good faith and to not intentionally and gratuitously harm Pagliara…
> *If the evidence ultimately shows that Johnston Barton negotiated the settlement in good faith and that the settlement was a reasonable compromise of [Butler]'s claim, then the firm will have discharged its duty to Pagliara. But if the defendant worked in concert with its client to purposely inflate the settlement amount beyond the actual value of the claim, with the intention of blemishing Pagliara's regulatory record, the plaintiff may recover his damages.*

(*Id.* at 18-19) (emphasis added).

Plaintiff maintains the evidence presented in this case demonstrates that Defendant "acted with a lack of good faith in numerous respects." (Docket Entry No. 54 at 15). Plaintiff claims (1) Defendant breached his contractual rights to defend the Butler claim, (2) Defendant carved him out of the release provision of the Settlement Agreement, (3) the Settlement Agreement left him exposed to further claims by Butler[9], (4) Defendant orchestrated a claim in an amount that would permanently blemish his record, (5) no investigation was conducted into Butler or his background, and (6) his interests were wholly unrepresented. (*Id.* at 15-16). Additionally, Plaintiff submits that the evidence shows the settlement was excessive, not a reasonable compromise, and done with an intent to harm Plaintiff.

Defendant asserts, conversely, that there is "no evidence upon which a jury could reasonably find that Johnston Barton worked in concert with its client, NBC[S], to purposely inflate the settlement amount beyond the actual value of Butler's claim or did so with the intent of blemishing Pagliara's regulatory record." (Docket Entry No. 46 at 18). Defendant advised NBCS on the "risks, uncertainty, and costs of defending the claim," and ultimately NBCS made a decision to settle if it could be "accomplished on a reasonable basis." (*Id.*). Furthermore and of importance, under the License Agreement, NBCS had the exclusive right to settle any claim

---

[9]  Although Plaintiff mentions throughout his brief that the Settlement Agreement "left him exposed to further claims by Butler" and "NBCS initially planned to seek indemnity" for the costs of defending the claim, ultimately, neither Plaintiff nor Capital Trust paid anything in connection with the Butler settlement.

11

against it or its representatives, without prior approval of Capital Trust or Plaintiff. (*Id.* at 23 and Docket Entry No. 47 at Exh. B).

After analyzing the particular facts and circumstances of this case, it is apparent that the relationship between Plaintiff and Defendant was one "where (at least partially) confidence was placed by one in the other and the recipient of that confidence was the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party." *See Winfree*, No. M2006-02340-COA-R3-CV, 2009 WL 113242, at *12 (Tenn. Ct. App. Jan. 15, 2009).

Nevertheless, having considered this Court's previous Memorandum and Opinion in relation to the pending motion for summary judgment and the particular facts and circumstances herein, the undersigned finds the evidence shows that Defendant negotiated the settlement in good faith (with no intent to harm Plaintiff's reputation) and that the settlement was a reasonable compromise of Butler's claim; therefore, Defendant discharged its duty to Pagliara. Furthermore, there has been no evidence presented wherein Defendant worked in concert with NBCS to purposely inflate the settlement amount beyond the actual value of the claim. Consequently, Plaintiff's allegations are insufficient to support his breach of fiduciary claim.

**B. Mental Distress Damages**

"Proof of damages is an essential element of" a fiduciary duty claim, *Union Planters Bank of Middle Tenn. v. Choate,* No. M1999–01268–COA–R3–CV, 2000 WL 1231383, at *3 (Tenn. Ct. App. Aug. 31, 2000), as is causation of damages. *See* Restatement (Second) of Torts § 874 ("One standing in a fiduciary relation with another is subject to liability to the other for harm *resulting from* a breach of duty imposed by the relation."); 23 Tennessee Practice *Elements of an Action* § 8:1 (2009) (including damages and proximate cause as elements to the cause of action

12

for fiduciary duty).

Plaintiff claims he is entitled to recover for the mental suffering he has incurred as a result of Defendant's intentional breach of fiduciary duty.[10] (Docket Entry No. 54 at 18). In direct reaction to the purported intentional conduct, he has become angry, has trouble sleeping, and has been distracted from his daily routine and business – as well as having to deal with the issue of whether to "take it or fight back." (Pagliara 5/25/11 Dep. at p. 193-194). Plaintiff did not seek any counseling from a therapist, a psychiatrist, or a psychologist with respect to the mental suffering he claims in this case. He testified that he did not think it was necessary to seek counseling for his mental suffering because: "[He] could handle it on [his] own;" because he "wouldn't even consider something like that;" and because "it was a business problem, and [he] do[esn't] know too many therapists that are good at business problems." (*Id.* at p. 209).

Tennessee permits the recovery of damages for emotional injuries standing alone that result from another's extreme or outrageous conduct. *Wilson, et al.*, 2008 WL 4211117 at *6 (Tenn. Ct. App. 2008); *Moorhead v. J.C. Penney Co., Inc.,* 555 S.W.2d 713 (Tenn. 1977) (permitting recovery of damages for mental distress without accompanying physical injury where the mental anguish was due to the "extreme and outrageous" conduct of the defendant).

Under Tennessee law, in order to establish a claim of intentional infliction of emotional distress, Plaintiff must prove that: (1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct must result in serious mental injury. *Bain v. Wells*, 936 S.W. 2d 618, 622 (Tenn. 1997). Liability for intentional infliction of emotional distress is only appropriate where "the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible

---

[10] In addition to mental suffering damages, Plaintiff sought consulting fees, lost revenue and attorney fees. It appears, however, he is foregoing these claims.

13

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bryan v. Campbell*, 720 S.W. 2d 62, 64 (Tenn. Ct. App. 1986).

Outrageous conduct does not include "mere insults, indignities, threats, annoyances, petty oppression or other trivialities." *Lane v. Becker et al.*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010); *Levy v. Franks,* 159 S.W.3d 66, 83 (Tenn. Ct. App. 2004); *Arnett v. Domino's Pizza I, LLC,* 124 S.W.3d 529, 539 (Tenn. Ct. App. 2003) (quoting *Bain,* 936 S.W.2d at 622). A plaintiff seeking damages for intentional infliction of emotional distress must meet an "exacting standard." *Lane*, 334 S.W.3d 756, 763 (citing *Miller v. Willbanks,* 8 S.W.3d 607, 614 (Tenn. 1999)). "Recovery for intentional infliction of emotional distress is limited to mental injury, which is so severe that no reasonable person would be expected to endure it." *Id.* (citing *Arnett,* 124 S.W.3d at 540).

While Plaintiff may have experienced some level of emotional anguish, Plaintiff's anger and trouble sleeping along with other related issues are simply insufficient to demonstrate the third element of intentional infliction of emotional distress – serious mental injury. *See Bain*, 936 S.W. 2d at 622; *see also Vanover v. White*, 2008 WL 2713711, *18 (E.D. Tenn. July 10, 2008)(serious mental injury is evinced by an inability to "cope" with the mental stress caused by the relevant events). As such, it is not necessary to consider whether the conduct alleged here "has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency."

Although Tennessee permits the recovery of damages for emotional injuries standing alone that result from another's extreme or outrageous conduct, the conduct complained of in this

instance does not rise to that level injury.  Hence, Plaintiff is not entitled to emotional damages[11] and the purported damages are further insufficient to support his breach of fiduciary duty claim.

Therefore, Defendant is entitled to summary judgment on Plaintiff's sole remaining claim.

## III.    Declaratory Relief and Punitive Damages

Lastly, Plaintiff avers even if the Court were to find he is not entitled to compensatory damages, he would "be entitled to nominal damages for Defendant's intentional tort," citing *Pagan v. Vill. of Glendale, Ohio*, 559 F.3d 477, 478 n.1 (6th Cir. 2009), wherein the Court held (in *Morrison v. Bd. of Educ.*, 521 F.3d 602, 610 (6th Cir. 2008)) that nominal damages "are a symbolic recognition of harm that may be awarded without proof of actual harm and 'have only a declaratory effect.'"  (Docket Entry No. 54 at 21).  Plaintiff requests a declaration that Defendant breached its duties to him.  (*Id.*).

A plaintiff is not entitled to declaratory relief in the absence of a viable claim.  *See Evans v. Walgreen Co.*, 813 F. Supp. 2d 897, 930 (W.D. Tenn. August 25, 2011) (citing *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 92 (6th Cir. 1997) ("With regard to Count IV, in which plaintiff seeks declaratory relief, plaintiff has merely asserted a form of relief, not a cause of action.  Plaintiff is not entitled to this relief in the absence of a viable claim.").  As Plaintiff has no viable claim, the request for declaratory relief must fail.

Plaintiff further argues that "such an award of nominal damages would, in the case of this *intentional* tort, support assessment of punitive damages" against Defendant for its alleged misconduct… [and] given the *proof of intentional and malicious conduct*, [Plaintiff] would be

---

[11]    Relying on several cases in his response brief, Plaintiff asserts he does not have to meet the requirements of intentional infliction of emotional distress to receive emotional damages, stating "Tennessee courts have a long history of awarding mental distress damages to victims of *intentional torts* in cases lacking both special damages and the elements of intentional infliction."  (Docket Entry No. 54 at 18) (emphasis added).  Even if the Court accepts this assertion, Plaintiff still has failed to meet the essential requirement as addressed in the cited cases – that of "intent."

entitled to punitive damages even [absent any] compensatory damages for emotional distress (*Id.* at 22-23) (emphasis added). Defendant disagrees and avers that "[e]ven if Plaintiff could prove he is entitled to nominal damages, [he] cannot prove actual damages, and is therefore not entitled to any punitive damages," citing *B&L Corp. v. Thomas and Thorngren, Inc.*, 162 S.W.3d 189, 223 (Tenn. Ct. App. 2004). *See* (Docket Entry No. 59 at 9).

To recover punitive damages, a plaintiff must prove, by clear and convincing evidence, that the defendant engaged in intentional, fraudulent, malicious, or reckless conduct. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 (Tenn. 1992). A person acts intentionally when "it is the person's conscious objective or desire to engage in the conduct or cause the result" and maliciously when he is "motivated by ill will, hatred, or personal spite." *Id.*; *see also Winkler v. Petersilie*, 124 Fed.Appx. 925, 2005 WL 450595 (C.A.6 (Tenn. 2005)).

The Court is not persuaded that Defendant engaged in intentional, fraudulent, malicious, or reckless conduct in connection with the Butler matter. Further, Plaintiff failed to demonstrate proof of any damages – whether it be actual or nominal – which, likewise, precludes recovery of punitive damages. Consequently, Plaintiff is not entitled to punitive damages.

## CONCLUSION

For all of the reasons stated, Defendant's Motion for Summary Judgment (Docket Entry No. 44) is hereby GRANTED.

An appropriate Order shall be entered.

_Kevin H. Sharp_
_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

16